Neil Wayne
**HIGGINBOTHAM, Appellant,**

v.

**STATE of Texas, Appellee.**

No. 413–89.

Court of Criminal Appeals of Texas,
En Banc.

Jan. 16, 1991.

Rehearing Overruled May 1, 1991.

Allen C. Isbell, on appeal only, Houston,
for appellant.

John B. Holmes, Jr., Dist. Atty., J. Harvey Hudson, Asst. Dist. Atty., Houston, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S AND APPELLANT'S PETITIONS FOR DISCRETIONARY REVIEW

OVERSTREET, Judge.

Appellant, Neil Wayne Higginbotham, was convicted of murder and sentenced to 50 years in the Texas Department of Corrections.[1] The Fourteenth Court of Appeals reformed the judgment to delete the affirmative finding, and affirmed appellant's conviction. *Higginbotham v. State*, 769 S.W.2d 265 (Tex.App.—Houston [14th] 1989, pet. granted). We granted appellant's petition for discretionary review to decide:

> Whether the Court of Appeals utilized the proper methodology for analyzing harm when an illegally obtained confession is admitted into evidence, and the defense is insanity.

On the afternoon of May 5, 1986, appellant entered the offices of Houston's First Methodist Church. Carrying a 9 mm automatic pistol, he took the elevator to the fifth floor and walked down the hall, passing several people. He warned passersby to "call an ambulance." Appellant entered the office of Reverend Anderson, and said he was looking for the senior pastor, Dr. Hinson. At gunpoint, appellant forced Reverend Anderson to take him to Dr. Hinson's office, but when they arrived Dr. Hinson was not there. In an empty office nearby, the two had a loud discussion in which Reverend Anderson was overheard to say "We've tried to help you ... I know you're serious" and appellant exclaimed

---

1. Now the Texas Department of Criminal Justice, Institutional Division.

"I'm serious. I mean it." This loud exchange was followed by a gunshot.

Then appellant backed out of the office into a hallway where he was met by another associate pastor. He pointed the gun at the pastor, who ducked into a nearby office. Appellant again got on the elevator, and when he reached the ground floor he was met with another associate pastor. He pointed the gun at the pastor, asked if Dr. Hinson was in the building, and when the pastor said he was not, appellant left.

According to a neighbor, appellant soon arrived at the home where he lived with his mother. The neighbor testified that appellant said "I shot a man and I need help, and I'm [the] son of King David, and call Pat Robertson," then disappeared into the house. While in the house, appellant told his neighbor over the phone that he would not come out for fear the authorities would harm him. The officers assured appellant over the neighbor's phone that they would not hurt him, so he surrendered and was arrested.

Appellant was taken to the Houston Police Department's homicide division and was given *Miranda* warnings. At that time, he did not indicate that he wanted a lawyer. When officers asked appellant if he would make a statement he responded first by speaking in tongues, then he told the officers that he shot a man at the church and witnesses saw him do it.

Shortly thereafter, appellant was taken before a magistrate and admonished. It was at this point that he requested an attorney. The magistrate told appellant he should ask the district judge, who he would see within 24 hours, for an attorney. Officers escorted appellant back to a police interview room, where they asked if he still wanted to talk to them. Appellant said he knew he would get an attorney later and, after two more sets of *Miranda* warnings, he gave the tape recorded oral confession challenged on direct appeal. At trial, ap-

pellant pleaded not guilty. His sole defense was insanity.

The Fourteenth Court of Appeals found that appellant's request for an attorney before the magistrate was an invocation of his Fifth Amendment right to counsel to prevent self-incrimination. *Higginbotham v. State,* 769 S.W.2d at 269 [citing *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)]. Therefore, the confession recorded afterwards at the police station was improperly obtained. *Id.* However, the court found that the admission of the confession constituted harmless error because:

> Appellant's confession was not the basis of the State's case.... There was an abundance of overwhelming evidence demonstrating appellant's guilt. The confession was merely cumulative of existing relevant facts; the State did not need this evidence to establish appellant's guilt in committing the crime.

*Id.,* at 272 (citations omitted). The court of appeals decided on this basis that the confession did not meaningfully contribute to the jury's guilty verdict, so that any error that occurred was harmless.

Appellant argues that the admission of the taped confession was harmful, not in the sense that it contributed to a finding of guilt, but that it affected the jury's rejection of appellant's insanity defense because of the calm demeanor exhibited by appellant while giving the confession.[2] There is evidence in the record to support this contention. In fact, the court of appeals acknowledged that

> the prosecutor's references to the confession did not dwell on the content of the appellant's statements. Instead, the prosecutor discussed [the interviewing officers'] impressions regarding appellant's demeanor during the interview.... The State did not urge the jury to consider appellant's statements as evidence of sanity. Instead, the State's arguments discussed appellant's apparent rational

---

**2.** The insanity defense, found at V.T.C.A. Penal Code, § 8.01(a), reads:

> It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of mental disease or defect,

either did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated.

conduct as viewed by third parties and challenged on the basis upon which [the defense expert] made his determination of appellant's mental condition.

*Id.,* at 273. The prosecutor also argued that a defense expert's testimony that appellant was insane at the time of the offense was less credible than the demeanor actually exhibited by appellant because so much time had passed before the defense expert actually examined appellant. *Id.*

Appellant attacks the methodology employed by the court of appeals in making its determination of harmless error. This methodology considered such things as the importance of the evidence in question to the State's case, the cumulative nature of the evidence, admission of corroborative or contradictory evidence, whether a curative or limiting instruction was or could have been given, the prosecutor's comments on the evidence, the defendant's prior history of arrests or convictions, and the overall strength of the State's case. *Id.,* at 272. Unfortunately, neither the parties nor the court of appeals had the benefit of this Court's opinion in *Harris v. State,* 790 S.W.2d 568 (Tex.Cr.App.1989). Prior to *Harris,* this Court had "failed to articulate a coherent standard for determining when an error is harmless." *Harris,* 790 S.W.2d at 584.

In *Harris,* appellant urged several points of error that this Court found to be harmless, and in so doing, clarified the procedure employed in making such a determination. *Id.,* at 588. This determination originates with the premise set out in Tex.R. App.Pro., Rule 81(b)(2), which provides:

If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

Although it is well established that the appellate court should not seek to take the place of a jury in making this determination, the difficulty inherent in this decision

was contemplated by the *Harris* court, which warned:

This approach obviously implicates a review of the evidence, but the concern is solely to trace the impact of the error. The untainted evidence is not to be weighed in its own right, nor is it to be examined to see if it is cumulative with the tainted evidence; it is to be considered only to uncover the potentially damaging ramification of the error. In other words, the impact of the error cannot be properly evaluated without examining its interaction with the other evidence.

It is important to note that in the context of a harmless error analysis the other evidence is the entire record. Unlike the dictates of *Jackson v. Virginia,* 443 U.S. 307 [99 S.Ct. 2781, 61 L.Ed.2d 560] (1979), in resolving the issue of the harmfulness of an error an appellate court is obligated to examine the entire record in a neutral, impartial and evenhanded manner and not 'in the light most favorable to the prosecution.'

*Harris,* 790 S.W.2d at 585–586. Moreover, Judge Duncan in writing for the *Harris* majority, anticipated the instant facts when he wrote:

A review of the evidence in this manner is necessary because, for example, *an error can be harmful when it has the effect of disparaging a defense,* whereas if there is no defense the error could have been harmless. [Emphasis added.]

*Id.* Appellant claims that the illegally obtained confession had the effect of disparaging his insanity defense in that it impacted on the jury's implicit finding that appellant was sane at the time of the offense. We agree.

■ In addition, the Court pointed out that standards for the determination of harmless error such as the "overwhelming evidence of guilt" test and the "correct result" test have been rejected by this Court. So, the reviewing court is not to focus on the propriety of the outcome of the case, rather it "should be concerned with the integrity of the process leading to

the conviction." *Id.,* at 587. Factors for the reviewing court to consider include:

the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. Further, the court should consider how much weight a juror would probably place upon the error. In addition, the court must also determine whether declaring the error harmless would encourage the State to repeat it with impunity.

*Id.* In short, the reviewing court must focus on "the process and not on the result." *Id.*

■ A detailed review of appellant's trial, in light of the above factors, reveals that appellant's assertion that the jury was likely influenced by the tainted confession is supported. It is also apparent that this influence affected the jury's implicit finding of sanity.

### A. The Source and Nature of the Error

In *Harris,* the Court analyzed this factor in terms of whether the State intended to taint the trial in offering inadmissible evidence. *Id.,* at 588. While it is unclear whether the State intended to taint the process in the instant case, the source of the error centers on a principle of law with which law enforcement personnel should be familiar. The record reflects that the very same two officers who originally questioned appellant in the interview room at the Houston Police Department, were the officers who accompanied him to the magistrate's court and heard his request for an attorney. Yet, the two officers took appellant back to the interview room and continued to interview him and tape record his confession. The source and nature of this improperly obtained confession are far more offensive than the error in *Harris,* and are inherently more harmful. Because *Harris* mandates that we concern ourselves with "the integrity of the process" leading to the conviction, *id.,* we find the nature of this error weighs particularly in favor of a finding of harm.

### B. Error Emphasized by the State

The court of appeals drew two polar conclusions about the State's use of the illegally obtained confession. The court stated that the prosecutor "did not dwell on the content of appellant's statements," instead he focused on "the appellant's demeanor during the interview." *Higginbotham v. State,* 769 S.W.2d at 273. However, the court also concluded that "the State did not urge the jury to consider appellant's statements as evidence of sanity," rather the prosecutor pointed out the "appellant's apparent rational conduct as viewed by third parties." *Id.* The actual argument by the prosecutor regarding the confession reveals that he made an obvious effort to connect appellant's demeanor with the insanity defense. The State argued:

I submit to you that first of all the state has proven by the way of its evidence that this defendant is guilty of murder. All the witnesses that testify from Dan Egle [sic] all the way to Sergeant Roy Ferguson who came in and gave a detailed statement in regards to this offense and Sergeant Ferguson had no indication of any mental illness on the part of the defendant during the interview, *that the defendant appeared to him to know that he had done something wrong,* that he was aware ... Sergeant Ferguson impressions [sic] is what I'm speaking about. His impressions were that the defendant was able to relate the offense to him, able to tell him what he had done in detail, that he was not detached from what was going on and there was nothing to indicate to Sergeant Ferguson that he didn't understand—there was nothing to indicate that he didn't understand the nature of the proceedings. That's Sergeant Ferguson's impression. [Emphasis added.]

Pointing out appellant's rational behavior at the time of the confession seems tantamount to an argument that the confession shows appellant was sane at the time the confession was given. Any rational trier of fact would be able to draw such a conclusion. The connection between appellant's demeanor at the time of the confes-

sion and his sanity at the time of the offense is less than tenuous.

Moreover, this Court's review of the record reveals many more instances in which the State emphasized the calm and collected state of appellant during the interview in which the confession was obtained.[3] For instance, during the State's examination of one of the interviewing officers, Sergeant Ferguson, the following line of questioning, regarding appellant's request to speak in tongues before the interview, ensued:

[BY THE PROSECUTOR]:

Q: Up until that time had the defendant exhibited any characteristics out of the ordinary?

[BY THE WITNESS]:

A: No, he was very calm.

Q: And then for some twenty to twenty five seconds he spoke in tongues. What happened after he spoke in tongues?

A: He was fine.

Q: Did he go back to the same demeanor or attitude characteristics that he had prior to that episode?

A: Yes, he did.

Again, during direct examination regarding appellant's hearing before the magistrate, the prosecutor pursued a similar line of questioning about appellant's demeanor.

[BY THE PROSECUTOR]:

Q: And was there anything that the defendant said that appeared to you to be out of the ordinary in such a proceeding?

[BY THE WITNESS]:

A: No, he was very calm and very attentive and appeared to know everything that was going on.

Once again, during questioning about the actual taping of the confession, the prosecutor asked Sergeant Ferguson questions that clearly demonstrated to the jury that appellant was collected at the time. For instance,

[BY THE PROSECUTOR]:

Q: And you've had an opportunity as the jury had, to hear the voice of Neil Higginbotham. Do you recall that being the same voice that was used, the same tone of voice that was used during the interview that you had beginning or leading up to the statement?

[BY THE WITNESS]:

A: Yes, sir, that's pretty much the same way he talked all the way through.

Q: Would you describe that voice as being a calm voice?

A: Yes, sir, I would say that he was relatively calm.

Q: And you indicated that he was being cooperative with you at all times?

A: Yes, sir, he was.

Q: Did you find that to be unusual or out of the ordinary for someone to be calm, to be cooperative in that type of situation?

A: Maybe just somewhat a little unusual due to the circumstances of what had happened.

Q: And how do you feel that was somewhat unusual?

A: Oh, many suspects that will come in will be—some may be quite nervous, some may be a little upset, some may even indicate remorsefulness and that didn't really come across with Neil.

Then, the prosecutor made his point once again in a most direct fashion, by asking:

[BY THE PROSECUTOR]:

Q: In any of the conversations that you had with the defendant was there anything that he said or did that would lead you to believe that he was emotionally unstable in regard to this incident?

[BY THE WITNESS]:

A: Neil was very calm and acted quite normal during the whole course of the interview.

The frequency of the prosecutor's questions regarding appellant's demeanor, and his emphasis on appellant's calmness during the recording of the confession itself, in

---

**3.** Generally speaking, demeanor evidence of this nature would be admissible and relevant when the defense of insanity has been raised by the accused, however, in this case, the demeanor

evidence utilized by the State was inexorably connected to appellant's inadmissible confession.

the context of the entire record, lead this Court to believe that the jury was likely influenced by the confession on the issue of insanity.

### C. Probable Collateral Implications of the Error

In *Harris*, the factor of collateral implications of the error seems to contemplate such things as the disparaging of a sole defense. *Id.*, at 585. Here, the collateral implications are severe and obvious. Because the jury heard the confession played in court, then was exposed to the prosecutor's questions about appellant's calm demeanor and cooperative attitude during the taping, the jury was apt to conclude that appellant was not insane at the time of the offense. Without the confession, the jury would be less likely to draw such a conclusion since the evidence also showed that, immediately after the shooting, appellant was hysterical and irrational. Witnesses testified that appellant went inside his home and showed great concern that the S.W.A.T. team had surrounded his house, and that he refused to surrender to anything but "Christian police." His neighbor testified that appellant told her to "call Pat Robertson" and that appellant thought he was "the Son of King David." In addition, defense witnesses testified about appellant's quick and unpredictable swings between rationality and total paranoia. His medical records, which were admitted into evidence, confirm appellant's constant shifting between normalcy and extreme paranoia. Reasonably, the jury might conclude after hearing the confession that appellant was calm at least a few hours after the offense.

Another harmful collateral consequence of the admission of the confession not discussed in *Harris* is the affect of such a confession on sentencing. It seems logical that a jury would be more likely to give harsher punishment to a defendant who seemed calm and unaffected after the offense, than one who shows remorse and disturbance after the crime. In at least one instance the prosecutor pointed out appellant's lack of remorse during the confession, and called attention to what sounded like a laugh from appellant in response to a certain question asked by the officers. Without admission of the illegally obtained confession, the State would not have had the chance to comment on whether appellant showed remorse. Therefore, a probable affect on the harshness of the punishment is also collateral to the admission of the confession.

### D. Probable Weight Placed on the Error By the Jury

The record supports appellant's contention that the jury placed great weight on the taped confession in its deliberations. First, during its deliberations, the jury sent out a note asking to have the taped confession and a tape recorder on which to play it. The court complied with the jury's request. Second, the jury deliberated for about eight hours, and was sequestered for a night, before reaching a verdict. Thirdly, before the jury came back with its verdict the trial judge himself commented on the difficulty of the case when he stated that "I don't think I can ever remember of any case that I've ever had any problem with in my mind determining what the verdict should be."

In light of the amount of evidence supporting both the State's and defense's theory about appellant's sanity at the time of the offense, this Court cannot discern that the confession was harmless beyond a reasonable doubt.

### E. Repetition of the Error With Impunity

In *Harris*, this Court sought to discourage the State from deliberately repeating conduct that constitutes error because that error was found to be harmless. *Id.*, 790 S.W.2d at 587. In the context of *Harris*, where the erroneous admission of extraneous offenses was determined to be harmless, the risk of the State repeating the error in direct response to this Court's holding was minute. As a practical matter, prosecutors in their roles as advocates for the State, will continue to seek admission of extraneous offenses during the guilt/innocence phase of trial, and often it will be

successful because of the great leeway provided by the exceptions to Tex.R.Cr.Evid., Rule 404(b).

In contrast, the use of an ill-gotten confession to disparage the defendant's sole defense presents a great risk to the fair administration of justice. It is not an issue of advocacy on the part of the prosecution. Rather, it is an issue of constitutional dimension capable of calling the fairness of an entire proceeding into question. Moreover, by discouraging the State from using such illegally obtained confessions for any purpose, it is possible that law enforcement will be discouraged from taking such confessions at all. With these distinctions in mind, it is apparent that a finding of harmless error in this case would present too great a risk that the error would be repeated.

Employing the considerations set out in *Harris*, we find that the State's use of the illegally obtained confession may have affected the jury's implied finding of sanity. Under Rule 81(b)(2), unless we find beyond a reasonable doubt that the error made no contribution to the conviction or the punishment, we must reverse. Therefore, the judgment of the court of appeals is reversed and the cause remanded to the trial court for a new trial.[4]

McCORMICK, P.J., and TEAGUE, MILLER and WHITE, JJ., concur in the result.

MALONEY, J., not participating.

CLINTON, Judge, concurring.

Distilling from *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and a host of its followings—none concerning a confession by an appealing defendant—the court of appeals concluded that admitting an uncounseled confession of appellant was harmless beyond a reasonable doubt and did not contribute to his

---

4. This Court also granted the State's petition for discretionary review on an unrelated issue. That petition is hereby dismissed as improvidently granted.

1. *Fahy v. State of Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963):

conviction or punishment. *Higginbotham v. State*, 769 S.W.2d 265, at 272–274 (Tex. App.—Houston [14th] 1989).

Today, the majority explores "the methodology employed by the court of appeals" and attributes any deficiencies to the fact that "[u]nfortunately, neither the parties nor the court of appeals had the benefit of this Court's opinion in *Harris v. State*, 790 S.W.2d 568 (Tex.Cr.App.1989)." At 734. Doubtful that want of the *Harris* opinion necessarily brings misfortune to an appellate court, my purpose in writing is to suggest that this Court still has "failed to articulate a coherent standard for determining when an error is harmless," *Id.*, at 584.

Introducing its examination of Tex.R. App.Pro. 81(b)(2), the *Harris* court mentions a prior opinion of this Court recognizing that the rule is "the rhetorical and semantic equivalent of the harmless error standard announced by the Supreme Court in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)," and pointing out that "the rule is a ternary standard of review in which reversal of a conviction is mandated unless the appellate court concludes beyond a reasonable doubt that the error did not contribute to the conviction or the punishment assessed." *Id.*, at 584.

In *Chapman v. California*, supra, the Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt," *id.*, at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710–11, and it was most sanguine about application of its holding, *viz:*

"... While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, although achieving the same result as that aimed at in our *Fahy* case."[1]

---

"... We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. *The question is whether there is a possibility that the evidence complained of might have contributed to the conviction.* To decide this question, it is nec-

Rather than accept for analytical purposes those explications of the rule, the *Harris* opinion lays down a premise that the rule is "expressed in conclusory terms that implicate subjective concerns [without] the objective standards that must be explored to reach a legally correct result," *id.*, at 585, and after engaging in a discussion of perceived ambivalences in the literature and cases, attributes its "difficulty in reconciling [them]" to "a natural reflection of an inherently subjective process," *id.*, at 585–587, and comes to an unhappy conclusion, *viz:*

> "... Thus, the most this Court can do in guiding future harmless error analysis is to state a general formulation of what 81(b)(2) requires, set out general considerations which may be relevant, and trust individual judges to use these observations in their personal calculus."

*Id.*, at 587. Surely, we must do better than that.

Those "general considerations" and the summaries thereof, *id.*, at 587–588, are such a melange of unrelated or inapposite propositions that a reviewing court is left free to place one or more on the "skeleton" and then make its determination on unprincipled and irrational grounds. In my view, most are at odds with an identifiable narrow body of appellate law that provides definitive and protective constraints against mere subjective evaluation. See and compare *Harris, supra* (Clinton, J., dissenting at 594 and 603–604).

First and foremost, those parts of the *Harris* opinion are permeated with a fixation over process: "Instead [of focusing on propriety of outcome of trial], an appellate court should be concerned with *the integrity of the process leading to conviction* [;]" among other determinations suggested are "whether declaring the error harmless would encourage the State to repeat it with impunity." *Id.*, at 587–588. But, like other similar provisions, the concern of Rule 81(b)(2) is to secure valued rights of an accused rather than to deter prosecutorial mistakes and preserve integrity of the trial process.

The rule was designed and intended to protect and implement due process rights to a fair and impartial trial. Its command is that for error of record an appellate court SHALL reverse the judgment under review UNLESS the court determines beyond a reasonable doubt that the error made no contribution to conviction or to punishment. That presumptive reversal is to ensure that an accused has a trial free from prejudicial errors. To preserve judicial integrity and to scotch egregious conduct, courts may exercise other powers, separate and apart from their appellate and reviewing authority. *See, e.g., United States v. Hastings,* 461 U.S. 499, at 505–510, 103 S.Ct. 1974, at 1978–191, 76 L.Ed.2d 96, at 103–107 (1983).

Indeed, here the majority treatment of what it calls "Repetition of the Error With Impunity," At 738, demonstrates that principled application of the rule to facts of the case and evidence adduced at trial to find reversible error renders this socalled "factor" superfluous in the analysis. No rational appellate court would refuse to reverse the judgment on the specious notion that "the State was *not* attempting to taint the trial process in offering as evidence the [confession]," *Harris*, at 588.

The fixation with process has inflicted the majority here in dealing with other "factors" identified in *Harris*. Thus it introduces its treatment of "The Source and Nature of the Error" by pointing out: "In *Harris*, the Court analyzed this factor in terms of whether the State intended to taint the trial in offering inadmissible evidence." At 735. Then it comes face to face with a practically invariable certainty, i.e., "... it is *unclear* whether the State intended to taint the process in the instant case." *Id.*[2] Whether "unclear" or "appar-

---

essary to review the facts of the case and the evidence adduced at trial." *Id.*, at 86–87, 84 S.Ct. at 230, 11 L.Ed.2d at 173 (emphasis added here and throughout is mine unless otherwise indicated).

**2.** Compare *Harris*, at 588: "In reviewing the record it is *apparent* that the State was not attempting to taint the trial process in offering as evidence the extraneous offenses." The opin-

ent," however, in my judgment such an *intent* on the part of the prosecutor is not germane to a harm analysis. While one can only surmise what *Harris* means by "*the source* of the error," *id.*, at 587, surely it does not include subjective intent of the prosecutor in the case. The harmless error rule is not an exclusionary device to deter prosecutorial overreaching or police misconduct.

Finding the record barren of a revelation of intent of the State, personified by the prosecuting attorney, the majority extends the "process" by going to the "source" of the constitutionally impermissibly tainted evidence—two peace officers who conducted the interrogation and obtained the confession—to conclude that "the nature of this error *weighs* particularly in favor of a finding of harm." *Id.*, at 735.

A harmless error analysis is not a balancing test; the analyst does not review a checklist of prospective "pro-con factors" to which more or less weight is assigned to one or another "factor" to determine whether an error contributed to conviction or punishment. In the instant cause our ultimate inquiry is whether, considering whatever consequential adverse ramifications to defendant are found from an examination of the facts of the case, erroneous admission of the tainted confession might have affected normal rational jurors. *Harris, supra* (Clinton, J., dissenting at 594).

Apart from its examination of the "source of error" and "repetition with impunity," At 735 and 738, in my view that is essentially what the majority does in considering and discussing "Error Emphasized by the State," At 735–736; "Probable Collateral Implications of the Error," *id.*, at 737–738; "Probable Weight Placed on the Error By the Jury," *id.*, at 737.[3]

Accordingly, there is not a satisfactory basis within contemplation of Rule 81(b)(2)

for an appellate court to determine beyond a reasonable doubt that erroneous admission of appellant's confession made no contribution to the conviction or the punishment.

For those reasons I concur in the judgment of the Court.

---

ion makes no effort to demonstrate the apparentness of that negative proposition.

**3.** That the record here reveals a germane jury request and reflective comments by the trial judge is an unusual fortuitous circumstance, not be regarded as meeting some overt kind of requisite showing of "probable weight." In most

cases there is none, but an appellate court must still make an "intelligent judgment about whether the [error] might have affected [an average rational] jury," *Satterwhite v. State,* 486 U.S. 249, at 258, 108 S.Ct. 1792, at 1798, 100 L.Ed.2d 284, at 295 (1988).