**Michael Bennett MONROE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–92–00109–CR.**

Court of Appeals of Texas,
Texarkana.

Oct. 5, 1993.

Anthony P. Griffin, Anthony P. Griffin, Inc., Galveston, for appellant.

John B. Holmes, Dist. Atty., Carol M. Cameron, Asst. Dist. Atty., Houston, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

Michael Bennett Monroe appeals from a conviction for aggravated robbery. He pleaded guilty, and the jury assessed punishment at eighteen years' incarceration. In his sole point of error, Monroe contends that the trial court erred by allowing the State to introduce improper reputation and character testimony.

### BACKGROUND

On December 5, 1989, Monroe robbed a Circle K convenience store in Harris County. Dorothy Preyear, the store's manager, testified that Monroe pointed a gun at her during the robbery and that she subsequently called the police. Sergeant Scott K. Boyce of the Houston Police Department, who responded and spoke with Preyear shortly after the robbery occurred, observed Monroe driving away from the crime scene. Officer Boyce followed Monroe until other police vehicles arrived and commenced a high-speed chase. The chase ended when the police executed a rolling roadblock. Monroe contended that he stopped only when the car ran out of gas.

Monroe further testified that the police fired their weapons while he was still in the car and, when he exited the vehicle, the police continued to shoot at him. He also stated that at no time did he fire his weapon.

Officer Boyce testified that when the vehicles came to a stop, Monroe emerged with a firearm and pointed the weapon at a police vehicle. Officer Boyce then heard a gunshot and the sound of glass breaking. Boyce further stated that he and the other officers fired at Monroe for five to seven seconds until Monroe went down. Boyce testified that he saw Monroe fire his weapon twice during this exchange. Monroe was struck by five bullets. A trace metal test conducted on Monroe's hand after his capture indicated that he had recently fired a weapon. Sergeant Wayne Wendel testified that Monroe admitted having fired his weapon.

At the punishment phase of the trial, the State questioned Sergeant Boyce regarding Monroe's character and his reputation in the community. Boyce testified that, based on his conversations with people in the community, Monroe's reputation was not that of a peaceful and law-abiding citizen. Boyce also stated that in his opinion Monroe "had very violent tendencies and was dangerous to basically anyone that would come into contact with him in the right set of circumstances." Monroe contends that the trial court erred in permitting Sergeant Boyce to testify concerning his (Monroe's) character.

During the punishment phase of the trial, the State also introduced evidence that Monroe was not a peaceful and law-abiding citizen by the testimony of seven people, each of whom met Monroe while they worked in a convenience store. The prosecutor began her examination of each of the former convenience store employees by asking them for basic biographic data. She then asked if they had come into contact with Monroe on a specific date and how they were employed at the time. She asked each of them to identify Monroe in the courtroom. She then asked each witness whether he or she had an opinion as to whether Michael Monroe was a peaceful and law-abiding citizen. Each of the witnesses then testified that in his or her opinion Monroe was not a peaceful and law-abiding citizen.

Monroe contends that, in admitting the character testimony of the convenience store clerks, the trial court improperly admitted evidence of specific acts, namely unadjudicated extraneous offenses, rather than just opinion testimony. Monroe suggests that the State attempted to inform the jury, however indirectly, that he had robbed at least seven other convenience stores prior to the robbery at issue in the present case. Monroe argues that the State demonstrated its motives to get unadjudicated offenses before the jury during the questioning of a psychiatrist by asking the witness, "Well, whose choice is it when he [Monroe] went in and robbed those stores?" The court sustained Monroe's objection to this question, but Monroe did not follow up by asking that the jury be instructed to disregard the question and asking for a mistrial, as is required to preserve error. *See Coe v. State,* 683 S.W.2d 431, 436 (Tex. Crim.App.1984).

In the final argument, the prosecutor argued, "And how do we protect our victims? How do we protect Dorothy Preyear and other people that had strong opinions about whether he's peaceful and law-abiding? You decide." Monroe made no objection to this argument.

## PRESERVING ERROR

■ The State contends that Monroe's counsel failed to cite to the statement of facts properly in his brief, thus waiving any argument regarding the admission of the testimony.

In his brief, Monroe's counsel excerpted the testimony of Sergeant Boyce and he cited in a footnote to the testimony of two of the convenience store clerks "by way of example." Monroe's counsel did not, however, cite to any other allegedly improper testimony in making his appellate argument. Based on this deficiency in the appellant's brief, the State argues that this Court cannot properly analyze the admissibility of unidentified testimony, citing Tex.R.App.P. 74(d).

Rule 74(p) of the Texas Rules of Appellate Procedure, however, states that substantial

compliance with the dictates of Rule 74 is sufficient. In the present case, although Monroe's counsel cited only to the testimony of two of the seven convenience store clerks, the testimony of all seven of the clerks appears in sequence in the statement of facts. It was therefore not difficult to locate the complained-of testimony. Monroe's counsel substantially complied with Rule 74(d).

## SERGEANT BOYCE'S TESTIMONY

■ The State also contends that Monroe failed to make a timely objection to the testimony of Sergeant Scott Boyce. Initially, counsel for Monroe objected to a question asking Sergeant Boyce about Monroe's reputation for violence. The court instructed counsel to approach the bench, and this question was not answered. After the bench conference, the prosecutor asked the officer about Monroe's reputation for being law abiding. The officer testified that it was bad. Then the prosecutor asked the officer if he had formed a personal opinion about Monroe's "peacefulness and law-abidedness." The officer opined that, "The suspect had very violent tendencies and was dangerous to basically anyone that would come in contact with him in the right set of circumstances." At that point, Monroe's counsel objected to the answer on the basis of Rule 405 of the Rules of Criminal Evidence. The court then asked counsel to be more specific, and counsel stated that the question as well as the answer extended further than Rule 405 allowed.

■ Rule 404 of the Rules of Criminal Evidence essentially tells when character evidence is admissible. Rule 405 of the Rules of Criminal Evidence tells how such proof can be made. Counsel's objection that the question and answer exceeded what was permissible under Rule 405 adequately informed the trial court of his complaint. While the answer may not have been totally responsive, or could have been expressed more succinctly, to say that one has a violent character is another way of saying that the person is not peaceful. At the punishment stage of the

trial, the character of the defendant is an issue. Tex.R.Crim.Evid. 404(c). Whether a defendant is violent is a matter of importance to a jury that is required to assess punishment. Even though the answer in this instance did not conform to the usual description of having a bad character or reputation as to being a peaceful and law-abiding citizen, the answer does express character traits that are relevant to punishment. The determination of the admissibility of evidence is within the sound discretion of the trial court. *State v. Monroe*, 813 S.W.2d 701, 703 (Tex. App.–Houston [1st Dist.] 1991, pet. ref'd). We may not overturn the determination unless a clear abuse of discretion by the trial court has been shown. *Id.* We find that the trial court did not abuse its discretion in overruling this objection.

## THE FORMER CLERKS' TESTIMONY

■ Monroe complains about the testimony of the seven former convenience store clerks because, he contends, the method used by the State strongly implied that each of these clerks had also been the victim of an aggravated robbery. Evidence of extraneous unadjudicated offenses is not admissible during the punishment phase of the trial. *Grunsfeld v. State*, 843 S.W.2d 521 (Tex. Crim.App.1992).

At one time, Texas law provided only for admissibility of reputation evidence in addition to final convictions at the punishment stage of the trial. Rule 405(a) now provides that the character or trait of a character may be made by testimony as to reputation or by testimony in the form of an opinion. In addition to the routine questions inquiring if they had opinions as to whether Monroe was a peaceful, law-abiding citizen and what were those opinions, the clerks were asked if they were working as store clerks at particular times and on particular dates, and encountered Monroe while working. This type of specific inquiries is permissible only in cross-examination.[1] Allowing the specific inquiry

1. Rule 405(a) of the Texas Rules of Criminal Evidence provides that "cross-examination inqui-ry is allowable into relevant specific instances of conduct."

as to time and place and employment[2] at the time of the encounters with Monroe under the circumstances of this case was impermissible because this evidence created an inference of specific instances of extraneous unadjudicated offenses.[3] We find that the trial court erred in admitting the evidence of the specific time and place and employment of the witnesses' encounter with Monroe—when Monroe properly and timely objected to the questions.

■ Monroe's counsel failed to make a proper timely objection to the questions propounded to Gwendolyn Johnson, Mary Wilmot, and Charlotte Jones. The error was properly preserved by objections for Linda Hearn, Thomas Marr, Reginald Grissom, and Evelyn Mitchell. In order to preserve error in the admission of evidence, a party who has not raised a running objection or an objection to all the evidence on a certain subject at one time is required to object each time inadmissible evidence is offered. *Ethington v. State*, 819 S.W.2d 854 (Tex.Crim.App.1991). The admissions into evidence of the clerks' opinions were not objectionable, but the State's questions tying those opinions to conduct at a specific time and a specific place were.

The basis for not permitting extraneous unadjudicated offenses at the punishment stage of the trial is that the defendant has not received due process of law on those charges and had an opportunity to offer a defense. A determination that the trial court erred by admitting evidence implying extraneous offenses requires us to make a further examination to determine whether the error was reversible.

### HARMLESS ERROR ANALYSIS

■ The function of an appellate court's harmless error analysis is not to determine how the appellate court would have decided the facts, but to determine to what extent, if any, error contributed to the conviction or punishment. TEX.R.APP.P. 81(b)(2); *Harris v. State*, 790 S.W.2d 568 (Tex.Crim.App.1989). A reviewing court's responsibility when undergoing the harmless error analysis transcends determining whether the conviction was correct. *Id.* When undergoing the harmless error analysis, untainted evidence is not to be weighted in its own right, nor is it to be examined to see if it is cumulative with tainted evidence; it is to be considered only to uncover potentially damaging ramifications of error. *Id.* An appellate court, when undergoing the harmless error analysis is to calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence. If the overwhelming evidence dissipates the error's effect upon the jury's functioning in determining facts so that it did not contribute to the verdict, then the error is harmless. *Id.* The reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial, but instead it should be concerned with the integrity of the process and consequently it should examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, its probable collateral implications, how much weight the jurors would probably place upon the error, and whether declaring the error harmless would encourage the State to repeat it with impunity. *Higginbotham v. State*, 807 S.W.2d 732 (Tex. Crim.App.1991); *Harris v. State*, 790 S.W.2d 568.

In considering punishment, the jury had before it the evidence of the first degree felony to which Monroe had pleaded guilty. As we have set out earlier in the opinion, this evidence showed that Monroe used a gun to rob a Circle K store and that there was a high-speed chase by the police culminating in a shootout.

Monroe presented evidence about his childhood history, his participation in the

---

2. The only witness who was still working as a clerk (cashier) at the time of trial was Evelyn Mitchell.

3. We recognize that the appeals court in *Munoz v. State* faced a similar issue on the inference of extraneous offenses. 803 S.W.2d 755 (Tex. App.—Houston [14th Dist.] 1991), *pet. ref'd*, 809 S.W.2d 501 (Tex.Crim.App.1991). We do not embrace the majority opinion in *Munoz* and also find it distinguishable from the present case. The only testimony complained of in the *Munoz* decision involved statements made in the prosecutor's final argument.

school band, student council, as a member of the baseball and football teams, about his attending Wharton Junior College for two years, about his working in a home for orphaned children as a counselor and recreation specialist, about his work as a counselor at Hope Center for Youth, about his work for the vocational guidance service as a drug counselor for probationers and parolees, and about his work with Covenant House and Belair General Hospital psychiatric unit as a counselor for people with family problems and drug problems. He also testified as to his personal trauma caused by the untimely death of his wife in an automobile accident and by later finding the body of a friend who had been addicted to cocaine. He also testified that, after the death of his spouse, he had a legal fight with relatives concerning his teenaged daughter.

The State offered eight witnesses who testified in their opinion that Monroe's character was bad as to being a peaceful and law-abiding citizen. This evidence is clearly admissible at the punishment stage. This admissible evidence created an inference that Monroe had committed violent, illegal acts. This type of character evidence, as well as reputation evidence, invites speculation. The inadmissible portion of the evidence also invited speculation. It created the implication that separate acts occurred to each individual witness while he or she was on duty as a clerk at a particular time and place.

Without the inadmissible evidence, the jury would still have had before it evidence of the aggravated robbery to which Monroe had pleaded guilty, the testimony of the three witnesses who testified about their encounter with Monroe at a certain time during their employment (this evidence came in without a timely objection), and three other witnesses plus the police officer presenting testimony that Monroe's character traits were bad as to being peaceful and law abiding. Assuming the jury inferred that robberies had occurred at the specific times and places testified about by the four former clerks, this evidence would tend to have little prejudicial impact on the jury in light of the three former clerks' testimony that came in without objections. In other words, the unobject-ed-to evidence showed that Monroe had committed other convenience store robberies. This unobjected-to evidence tends to dissipate the erroneous evidence's effect upon the jury's functioning in determining punishment.

The record suggests that the State was well aware of the implication of the extraneous acts brought about by its method of presenting the character witnesses and that the State calculated that this method of presenting the evidence would convey this message to the jury. However, under the majority opinion in *Munoz v. State*, which was the only case directly in point at the time of trial, the State was justified in presenting the evidence in this manner. Therefore, the State cannot be criticized for using an approach that had been approved by an appellate court and disapproved by none. Our holding of the present case should be a strong indication to the State that such evidence presented in future cases is likely to lead to reversal if the counsel for the defendant properly objects to the evidence.

The jury was not moved by the improper evidence to assess a punishment toward the maximum limits for an aggravated robbery, life or ninety-nine years, but instead, Monroe was assessed eighteen years' incarceration. After reviewing the entire record in light of the standards we have set forth, we find beyond a reasonable doubt that the admission of the evidence by the four witnesses as to the specific times and places that they encountered Monroe did not contribute to his punishment.

The judgment of the trial court is affirmed.

BLEIL, Justice, dissenting.

The majority correctly concludes that the trial court erred in admitting evidence of unadjudicated extraneous offenses.

Under Rule 81(b)(2), once an error is discovered, the appellate court is obligated to reverse the judgment unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment. TEX. R.APP.P. 81(b)(2); *Mallory v. State*, 752 S.W.2d 566, 570 (Tex.Crim.App.1988). The

majority finds that evidence of extraneous offenses committed against four convenience store clerks was cumulative and had little prejudicial impact.[4] With much mitigating evidence, Monroe nevertheless received eighteen years' confinement. The sentence most certainly might have been lower had the trial court excluded the improper evidence. To conclude beyond a reasonable doubt that the jury would not have assessed a different punishment had the testimony of four witnesses been excluded is unsupported speculation.

I cannot agree with the majority's determination that, beyond a reasonable doubt, the erroneous admission of evidence tending to show that Monroe had robbed other convenience store clerks' made no contribution to the punishment Monroe received. For this reason, I would hold that the trial court's errors in the punishment stage of the trial require a partial reversal of the judgment and a remand to the trial court for a new trial of the punishment stage of the trial. *See* TEX.CODE CRIM.PROC.ANN. art. 44.29(b) (Vernon Supp.1993).

I also write to express my disapproval of what appears to be a trial tactic on the part of the Harris County district attorney's office.

The tactic employed in this case is like that employed in *Munoz v. State.*[5] Munoz was charged with sexual assault offenses against three women victims. He was convicted of assaulting each of them on three separate occasions on a jogging trail next to a bayou in Houston. After the jury found him guilty, the State called five women to give their opinion as to whether he was a law-abiding or peaceful man.

Each of these five witnesses "met" Munoz while on a bayou jogging trail in Houston.

Four of them opined that he was not peaceful and law abiding. The fifth opined that he had attacked her on the trail and, after an objection and an instruction to disregard her testimony was given, the State did not ask her for her opinion. 803 S.W.2d at 757–58. Patently, the State called these witnesses to show unadjudicated extraneous offenses under the guise of eliciting opinions of Munoz's character as a peaceful and law-abiding person.

Here, Monroe was charged with aggravated robbery of a convenience store clerk. Upon conviction, the State paraded seven different persons who had "met" Monroe while they were at work as a convenience store clerk. How convenient. Purportedly, they were called as opinion witnesses to prove Monroe's character as a peaceful and law-abiding citizen pursuant to the rules of evidence. TEX.R.CRIM.EVID. 405. The opinions given were that Monroe was not a peaceful and law-abiding citizen. However, it is obvious that the greater reason for this parade of convenience store clerks was to convey to the jury that he had probably robbed or attempted to rob them also—extremely serious unadjudicated extraneous offenses. Had the prosecutor admitted that this was the purpose of the evidence, Rule 404(b) would prohibit its admission. TEX. R.CRIM.EVID. 404(b).[6]

While there is a fine line between astute trial tactics and foul play, this prosecutorial practice crosses the line and should be condemned. This practice is one which, because of common sense and because of the common law, an attorney should know not to do it, and a judge should know not to tolerate it. *See Skidmore v. State,* 838 S.W.2d 748, 757 n. 7 (Tex.App.—Texarkana 1992, pet. ref'd) (Bleil, J., concurring). The majority correctly recognizes that a proper consideration is

---

**4.** Seven persons who had met Monroe while they were convenience store clerks testified. As noted by the majority, three of the clerks testified without timely and proper objection. The testimony of the other four clerks was admitted over timely and proper objections by defense counsel.

**5.** This decision is cited by the majority and is found at 803 S.W.2d 755 (Tex.App.—Houston [14th Dist.], *pet. ref'd,* 809 S.W.2d 501 (Tex.Crim. App.1991).

**6.** The prosecutor's position is no more valid than if she had called say, a rose not a rose, but a red flower. Long ago, Shakespeare gave ample retort to such a proposition, saying a rose "[b]y any other name would smell as sweet." WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 2, 1. 44 (Tucker Brooke et al. eds., 3rd ed. 1935).

whether declaring the error harmless would encourage the State to repeat it with impunity. *Harris v. State*, 790 S.W.2d 568, 587 (Tex.Crim.App.1989). Nevertheless, the majority declares this error harmless, giving prosecutors the green light to continue a practice which ought to be soundly condemned. This is another reason why I cannot join in the majority's decision.