NUMBER 13-03-00388-CR


 

COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS


 

CORPUS CHRISTI - EDINBURG 


 

 

RAUL ADAM MARTINEZ, JR., Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the 248th District Court

 of Harris County, Texas.

 

MEMORANDUM OPINION ON REMAND

Before Chief Justice Valdez and Justices Yañez and Benavides


Memorandum Opinion on Remand by Chief Justice Valdez


 This case is before us on remand from the Texas Court of Criminal Appeals. See
Martinez v. State, 272 S.W.3d 615 (Tex. Crim. App. 2008). A jury found appellant, Raul
Adam Martinez, Jr., guilty of the offense of capital murder, and the trial court assessed
punishment at life imprisonment. See Tex. Penal Code Ann. §§ 12.31(a)(2), 19.03(a)
(Vernon Supp. 2009). By a single issue, Martinez asserts that his videotaped statement
should not have been admitted into evidence at trial because Miranda warnings were not
given at the beginning of the interrogation process. See Miranda v. Arizona, 384 U.S. 436,
445 (1966). 

 On original submission, this Court, after applying Justice Souter's plurality opinion
in Missouri v. Seibert, 542 U.S. 600 (2004), concluded that the admission of the videotaped
statement was not constitutional error because it was made after a proper and functional
Miranda warning. Martinez v. State, 204 S.W.3d 914, 921 (Tex. App.-Corpus Christi
2006), rev'd, 272 S.W.3d 615 (Tex. Crim. App. 2008). One justice dissented, concluding
that: (1) Martinez's statement was inadmissible because it was "obtained pursuant to a
deliberate two-step interrogation technique used to undermine the effectiveness of Miranda
warnings"; and (2) the admission of the videotaped statement was harmful. Id. at 922
(Yañez, J., dissenting).

 The court of criminal appeals granted Martinez's petition for discretionary review and
concluded that Martinez's videotaped statement was inadmissible because "officers did not
apprise Martinez of his Miranda rights when they began his custodial interrogation and
failed to apply any curative measures in order to ameliorate the harm caused by the
Miranda violation." Martinez, 272 S.W.3d at 627. Accordingly, the court reversed and
remanded, directing us to conduct a harm analysis. Id. We reverse and remand for a new
trial.

I. Factual Background

 In the early morning hours of August 3, 2002, two men, one carrying a rifle and one
carrying a pistol, approached Alfredo Balderas Loredo ("Balderas"), Gustavo Camilo, and
Manuel Arriaga Molina ("Arriaga") in the back parking lot of a Houston apartment complex. 
Balderas and Camilo described the gunmen as Hispanic males and identified the man
carrying the rifle as short and heavy and the man carrying the pistol as tall and skinny.

 At trial, Balderas testified that the gunmen approached him and demanded money. 
The man with the rifle held it to Balderas's stomach, while the man with the pistol pointed
his weapon at Camilo and Arriaga. Balderas also testified that he pushed the rifle away
from his stomach and Arriaga moved to "help" him but was shot in the stomach. Balderas
stated that the men then shot Camilo in the stomach, "knocked" Balderas to the ground,
took his wallet, shot him in the neck, and fled. Arriaga died a few hours after the incident. 
Ballistics evidence indicated that all shots fired during the incident originated from a
handgun.

 Neighbors, Elizabeth Mercado and Percy Johnson, testified that they lived across
the street from the apartment complex. Johnson stated that on the night of the shootings,
he saw a four-door Pontiac Grand Am drive into the apartment's parking lot; Mercado
testified that the vehicle was red. Johnson stated that he saw two men exit the vehicle,
then saw the vehicle reverse and park on the street in front of the apartment complex. A
short time later, Mercado and Johnson heard two gunshots and saw two "Chicano" men,
one "fat" and one "skinny," return to the vehicle and enter on the passenger's side; then
the vehicle drove away. 

 No suspects emerged in this case until the department received a Crime Stoppers
tip identifying Martinez and James Ruiz as primary suspects. When presented with a
photo array, Balderas identified Martinez as the short, heavy man who had pointed a rifle,
and Ruiz as the tall, skinny man who had wielded a pistol. Camilo only identified Martinez
as a gunman. No guns, stolen wallets, or a red Pontiac were ever located. However, the
jury heard evidence that Martinez owned a green Chevrolet Malibu as well as a "shotgun"
similar to the rifle used in the robbery. Officer Marcario Sosa testified that Chevrolet
Malibus and Pontiac Grand Ams "have similarities" because they are manufactured by
General Motors. 

 After Martinez was identified as a suspect, Officer Sosa arrested him and took him
to the police station. (1) Upon arriving at the police station, Officer Sosa and his partner,
Officer Toby Hernandez, questioned Martinez about the robbery and murder; however, no
Miranda warnings were given at the scene of the arrest or at the police station. Martinez
denied knowing anything about the incident. Shortly thereafter, the officers took Martinez
to a police polygraph examiner and a polygraph test was administered. After the test,
Officer Sosa informed Martinez that he had failed the polygraph exam. Martinez was then
taken to municipal court where a magistrate gave him Miranda and other statutory
warnings. Next, Martinez was taken to the Houston Police Department's central holding
station. At the holding station, Officer Sosa repeated the Miranda warnings and then
questioned Martinez; this interrogation was videotaped. 

II. Procedural Background

 Before trial, Martinez filed a motion to suppress his videotaped statement. At the
suppression hearing, Martinez claimed that he had not received Miranda warnings either
when he was arrested or before the polygraph examination. The trial court concluded that
Martinez had voluntarily and knowingly waived his right to remain silent and admitted the
videotaped statement. 

 Upon review, the court of criminal appeals described the contents of the video as
follows:

At the beginning of the video, appellant stated that he had become aware of
certain facts about the crime through the polygraph examiner. Although
before the polygraph appellant asserted that he was not aware of the robbery
and murder, on the videotape appellant discussed pertinent information
regarding the crime. Appellant further stated that he was not one of the
assailants who had robbed and shot the victims, but rather was a "lookout"
person. He maintained that he had remained in the backseat of his Chevy
Malibu throughout the incident. Appellant had initially stated that there were
only three persons involved, but after Officer Sosa informed him of conflicting
information, he then stated that there were four persons involved in the
incident. Appellant also asserted that the individual who was actually
carrying the rifle resembled appellant and that they could easily have been
mistaken for each other.


Martinez, 272 S.W.3d at 618. The court of criminal appeals then concluded: 

 It is evident that the officers treated the videotaped interrogation as a
continuation of the first . . . Officer Sosa referred to the first interrogation and
restated what he had told appellant during the first interview. While the
questions and answers from the first round of interrogation are not in the
record, we can conclude from Officer Sosa's reference to the first
interrogation that appellant could reasonably assume that a continuity
existed between the two interrogations.


 On the video, Officer Sosa began by reading the Miranda warnings to
appellant. He then asked appellant if he understood his rights, and appellant
replied affirmatively. Both officers, however, failed to inform appellant that,
based on the lack of Miranda warnings, any prior statement made during a
previous interrogation, including the polygraph exam, could not be used
against him.


Id. at 625-26 (footnotes omitted). Accordingly, the court of criminal appeals deemed the
videotaped statement inadmissible and reversed and remanded. Id. at 627. On remand,
we determine whether the admission of Martinez's videotaped statement contributed to the
jury's guilty verdict. 

II. Harm Analysis

A. Standard of Review

 The admission of incriminating statements made during a custodial interrogation
where no proper Miranda warnings were given constitutes constitutional error. See Tex.
R. App. P. 44.2(a); Akins v. State, 202 S.W.3d 879, 891-92 (Tex. App.-Fort Worth 2006,
pet. ref'd.). Constitutional error requires reversal "unless the court determines beyond a
reasonable doubt that the error did not contribute to the conviction or punishment." Tex.
R. App. P. 44.2(a). In conducting this analysis in the context of a Miranda error, we must
judge the magnitude of the error in light of the evidence as a whole to determine the
degree of prejudice to the defendant resulting from that error. Jones v. State, 119 S.W.3d
766, 777 (Tex. Crim. App. 2003); see Wesbrook v. State, 29 S.W.3d 103, 119 (Tex. Crim.
App. 2000). In other words, "[w]e must review whether the admission of appellant's
statement contributed to the jury's verdict of guilty in this cause, regardless of whether
there is evidence independent of the statement that is otherwise sufficient to sustain the
jury's verdict of guilt." McCarthy v. State, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001).

 In determining whether constitutional error in the admission of evidence is harmless,
we consider several factors, including: (1) the importance of the evidence to the State's
case; (2) whether the evidence was cumulative of other evidence; (3) the presence or
absence of other evidence corroborating or contradicting the evidence on material points;
(4) the overall strength of the State's case; and (5) any other factor, as revealed by the
record, that may shed light on the probable impact of the error on the mind of the average
juror. See Clay v. State, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). Other cases
indicate that we may consider additional factors such as the source and nature of the error,
the emphasis placed upon the evidence by the State, the probable collateral implications
of the error, the weight a juror may have placed on the evidence, and whether finding the
error harmless would encourage the State to repeat the conduct. See Higginbotham v.
State, 807 S.W.2d 732, 735 (Tex. Crim. App. 1991); Harris v. State, 790 S.W.2d 568, 587
(Tex. Crim. App. 1989). A constitutional error does not contribute to the conviction or
punishment if the jury's verdict would have been the same even if the erroneous evidence
had not been admitted. Clay, 240 S.W.3d at 904.

B. Analysis

 We first note that the State offered evidence of Martinez's guilt independent of his
videotaped statement by offering the testimony of eyewitnesses who identified Martinez
from a photo array. The jury also heard evidence that Martinez's car and shotgun were
similar to the ones used in the robbery. While this evidence is compelling and indicates
the strength of the State's case, "harmlessness [is] not determined solely on the basis of
whether there [is] sufficient evidence, independent of the defendant's inadmissible
statement, for a reasonable jury to reach the same conclusion which it . . . reached with
the statement." McCarthy, 65 S.W.3d at 55 (citing Satterwhite v. Texas, 486 U.S. 249
(1988)). "We must review whether the admission of appellant's statement contributed to
the jury's verdict in this cause, regardless of whether there is evidence independent of the
statement that is otherwise sufficient to sustain the jury's verdict." Id.

 In his videotaped statement, Martinez gave varying explanations as to the events
surrounding the robbery and murder. Martinez first stated that he and two other individuals
were involved; however, he later told police that a fourth individual participated. Martinez
also changed his story about who was driving. Despite these inconsistencies, in each
version of the events, Martinez maintained that he sat in the backseat of the car as a
"lookout," did not get out of the car during the incident, and did not personally shoot
anyone. He also stated that he knew that the other individuals in the car were going to "do
a lick," which Martinez defined as commit a robbery, and that he knew that a weapon would
be used in the commission of the robbery. 

 After the trial court read to the jury a charge instructing it on the law of parties and
the law of conspiracy, the State, in closing argument, stated: 

 The charge gives you four ways to find this defendant guilty of capital
murder. Now, those four ways that are based on the charge and the
evidence presented in this case, y'all [sic] can consider as a group. 
Basically--and y'all [sic] don't have to agree on which way the capital murder
was committed. Three of y'all [sic] can think it occurred one way. Six of y'all
[sic] can think it occurred another way. Three of y'all [sic] can think it
occurred a third way, but as long as twelve of you agree that a capital murder
occurred, this defendant is guilty of capital murder.


 Let me talk to you about the first way. That the defendant was the
shooter, the defendant specifically intended to cause the death of Mr.
[Arriaga]. . . .


 The second way, based on that jury charge, is he held the shotgun
while Ruiz shot Mr. [Arriaga] during the course of committing that aggravated
robbery. . . . 


 The third way is the conspiracy to commit capital murder. Basically
that the murder with those loaded weapons should have been anticipated by
Martinez as a result of carrying out that conspiracy. That means they sat in
the car and said, ["]Let's go get a lick,["] with loaded guns, and you go out
there with loaded guns, you can reasonably anticipate that someone's going
to die as a result of that. . . .


 The fourth way is as a party, as a lookout to that capital murder,
again, promote, assist in the commission of the offense, he solicits,
encouraged, directed or aided. If you believe this defendant's statement,
you take everything he says as true, says it here twice on this tape: ["]I was
a lookout. I was sitting in the car, looking around, knowing that these guys
were going to get a lick.["] You're a lookout and you're guilty of capital
murder.


 The State's closing argument emphasized Martinez's erroneously admitted
statement by instructing the jury that it could reach a guilty verdict by finding that Martinez
participated in the robbery and murder as a gunman, as a co-conspirator, or as a "lookout." 
No evidence other than Martinez's statement was presented to establish that Martinez was
a "lookout." 

 "A defendant's statement, especially a statement implicating [him] in the commission
of the charged offense, is unlike any other evidence that can be admitted against the
defendant." Id. at 55-56 (citing Arizona v. Fulminante, 499 U.S. 279, 296 (1991) ("[A]
defendant's own confession is probably the most probative and damaging evidence that
can be admitted against him. . . . [T]he admissions of a defendant come from the actor
himself, the most knowledgeable and unimpeachable source of information about his past
conduct."). 

 In McCarthy, the court of criminal appeals held that the erroneous admission of the
defendant's statement into evidence was harmful, even though the State offered ample
evidence of the defendant's guilt from sources independent of his statement. Id. The court
noted that although the defendant's statement did not place the murder weapon in the
defendant's hands, it was "powerful enough to establish her guilt of capital murder either
as a party or as a conspirator." Id. at 56. Although Martinez's statement was not used by
the State as extensively as that in McCarthy, its use here was just as damaging. 
Martinez's statement, if believed, established his presence at the location of the robbery
and murder, his involvement as a "lookout," and his knowledge of an intent to "do a lick." 
Thus, as in McCarthy, the State used Martinez's statement as direct evidence of his guilt
as a party or co-conspirator. Id. at 54. As McCarthy notes,

A confession is likely to leave an indelible impact on a jury. "If the jury
believes that a defendant has admitted the crime, it will doubtless be
tempted to rest its decision on that evidence alone, without careful
consideration of the other evidence in the case. Apart, perhaps, from a
videotape of the crime, one would have difficulty finding evidence more
damaging to a criminal defendant's plea of innocence." 


Id. at 56 (quoting Fulminante, 499 U.S. at 313 (Kennedy, J., concurring)).

 Moreover, because we are to consider any other factor, as revealed by the record,
that may shed light on the probable impact of the error on the mind of the average juror,
we note that, during its deliberations, the jury requested Martinez's videotaped statement,
among other items, for review. See Clay, 240 S.W.3d at 904. 

 In light of the foregoing, we cannot conclude, beyond a reasonable doubt, that the
jury's verdict would have been the same if Martinez's statement had not been admitted. 
See id.; McCarthy, 65 S.W.3d at 56. Because we are unable to conclude that Martinez's
statement did not contribute to the jury's verdict of guilt, we hold that its admission was not
harmless. Accordingly, we sustain Martinez's sole issue on appeal.

III. Conclusion

 We reverse the judgment of the trial court and remand for a new trial. See Tex. R.
App. P. 43.2(d); McCarthy, 65 S.W.3d at 56.

 ________________________

 ROGELIO VALDEZ

 Chief Justice

 

Do not publish. 

Tex. R. App. P. 47.2(b)

Delivered and filed

the 13th day of May, 2010. 


 
1. James Ruiz was not arrested because at the time he was identified as a suspect, he was deceased.