

# NUMBER 13-22-00230-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

RAUL LOPEZ,                                                                          Appellant,

v.

THE STATE OF TEXAS,                                                              Appellee.

## ON APPEAL FROM THE 93RD DISTRICT COURT
## OF HIDALGO COUNTY, TEXAS

## MEMORANDUM OPINION

### Before Justices Longoria, Tijerina, and Peña
### Memorandum Opinion by Justice Tijerina

A jury convicted appellant Raul Lopez of murder, three counts of attempted murder, three counts of aggravated assault, and attempted capital murder. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(7), 22.02(a)(2). The trial court sentenced him to a term of life imprisonment for murder and attempted capital murder, ten years for attempted murder, ten years for one count of aggravated assault, and fifteen years for

two counts of aggravated assault. The jury rejected the affirmative defense of insanity. *See id.* § 8.01(a). By four issues, Lopez argues: (1) the evidence is factually insufficient to support the jury's rejection of insanity; (2) the trial court erred in not granting his motion to suppress; (3) the multiple convictions violate double jeopardy[1]; and (4) the trial court erred in not striking improper punishment testimony. Because Lopez was not provided with sufficient *Miranda* warnings and this error was harmful, we reverse and remand.

## I. BACKGROUND

On November 28, 2016, Lopez was working the night shift at HEB as a grocery stocker with his coworkers Frailan Garza, Rafael Martinez, Billy Joe Martinez, and Mario Pulido. According to a statement Lopez provided to an expert, Frailan "had go[tten] on him for dropping a box and [Lopez] laughing about it, and he needed to clean it up." During his break, Lopez felt afraid that somebody was going to his home to harm his family, so he drove by his home to make sure the door was not broken down and to make sure there were no signs of harm. Thereafter, Lopez went back to HEB.

Around 3:00 a.m., Frailan, Rafael, Billy Joe, and Mario were eating in the break room. Lopez stood outside of HEB and started shooting at the break room windows. When he ran out of bullets, he reloaded his gun, and fired more shots. Rafael, Billy Joe, Frailan, and Mario were all shot; Rafael, Billy Joe, and Frailan were injured, and Mario died at the scene.

---

[1] The State concedes error on this issue and requests that we vacate seven out of eight counts. Because we reverse and remand, we need not address this issue. *See* TEX. R. APP. P. 47.1.

Immediately after the shooting, Lopez drove back to his residence to "drop off his vehicle," called 911, and identified himself as the shooter. The police arrived at Lopez's home and arrested him. Following his arrest, Lopez was interrogated by Detective Ezequiel Jurado with the Palmview Police Department where he provided a statement regarding his involvement in this offense.

## A. 911 Call

At trial, Lopez's 911 call was admitted into evidence:

| | |
|---|---|
| Raul Lopez: | Uh, yes, it's that, I was the one who shot right now at the HEB. |

. . . .

| | |
|---|---|
| 911 Dispatcher: | What happened? Why did you shoot at the HEB? |
| Raul Lopez: | Because, well I was fed up with them . . . . |
| 911 Dispatcher: | Who? |
| Raul Lopez: | Look, come get me, I'm here disarmed. |
| 911 Dispatcher: | Where? |

. . . .

| | |
|---|---|
| Raul Lopez: | Well, here, you know where I can be. You all have always known where I am . . . . Just come, come I'm here . . . . I'm here disarmed . . . . I don't have anything. |
| 911 Dispatcher: | You don't have anything. Where's the weapon? |
| Raul Lopez: | I threw it away. |
| 911 Dispatcher: | Where? |
| Raul Lopez: | Well I don't have it here. That's all I can say— |

. . . .

3

911 Dispatcher:     I have—hey, I have to know where the gun is.

Raul Lopez:     In an empty lot.

. . . .

911 Dispatcher:     Okay, well, I already have officers headed your way. Uh, you have no weapon.

Raul Lopez:     No.

. . . .

911 Dispatcher:     Let's see, where exactly did you throw the gun away?

Raul Lopez:     No, there is no gun.

911 Dispatcher:     Then, how did you shoot there at HEB?

Raul Lopez:     Huh?

911 Dispatcher:     How did you shoot there in the HEB if there's no gun?

Raul Lopez:     Who said I shot?

911 Dispatcher:     Well you, when you called you said it. Or not?

Raul Lopez:     No.

911 Dispatcher:     Then, what was it that happened?

Raul Lopez:     No, nothing happened.

911 Dispatcher:     Nothing happened?

Later, Lopez informed the dispatcher that "there [was] no gun," while also stating that he "threw it [over] there, [over] there, very far away." A female voice could be heard on the call. Lopez repeatedly pleaded with that voice, "Go, go, please go. Go love, please

4

go. Go love! They're coming, they're coming for me." Lopez continued to beg for the female to leave:

> Please go. They'll think that you're with me or something . . . . I came to [the house] to leave the vehicle . . . It's not your fault, please go . . . Go on with your life, please go on with your life . . . go on with your life . . . love I'm not going to be here anymore . . . . Forgive me.

The dispatcher inquired with whom Lopez was speaking. Lopez stated that he was not conversing with anyone; Lopez claimed that the voice the dispatcher heard was his own voice. Lopez stated he was talking to himself, and he liked to "make different voices." Lopez confirmed with the dispatcher that he would stay on the line until the officers "get here and they arrest me."

## B.    Lay Witnesses

At trial, there were several lay witnesses that testified that Lopez has had a long history of suffering from mental illness. Brizeidy Lopez, Lopez's sister, testified that a few weeks before the shooting, Lopez limited his communication with his family to only whispering because he did not want to use any phones. For example, he made his family leave their phones inside while they spoke with him outside because "they're watching him and hearing him." When Brizeidy asked Lopez who "they" were, Lopez explained it was "the government and the H-E-B." Lopez told Brizeidy that "he was already tired about everything, and he didn't know what to do." Lopez added that "no one liked him and that everyone will hear him and knew about his life." Brizeidy stated that Lopez was diagnosed with a mental illness in Mexico, but Lopez did not seek treatment.

Lopez's mother Benecia Saenz testified that she suffers from depression and anxiety. Three weeks before this incident, Lopez was "absent" and "fearful." He would

5

leave his cell phone in the truck, remove the battery, and make her turn off her cell phone. Lopez explained to Saenz that "they were after him, that they wanted to hurt him, that people wanted to know about his private life." According to Saenz, "they" was a reference to the government or the cyber police. Saenz stated that Lopez expressed he was "not sleeping, that he wouldn't sleep, that it had been a long time since he could sleep." Saenz also stated that Lopez was no longer "feeling relaxed" because he believed "they" were watching through the "balloons that get put up by the weather service and by border patrol."

Kimberly Lopez was Lopez's wife at the time of the shooting. Together, they had three daughters. She stated that Lopez struggled with insomnia. Before this incident, Lopez was having more trouble sleeping. Sometimes, he would only sleep two hours before his shift. There were times where he would go a whole day without sleeping, which became more frequent. For instance, Kimberly estimated that he would only get a full eight hours of sleep one day during the week, and the other seven days varied between one or two hours of sleep. Kimberly stated that Lopez would take melatonin and sleeping pills, which temporarily allowed him to rest, but then he would suffer from insomnia again. According to Kimberly, Lopez would get irritated very easily, "[i]f the girls would cry or there would be screaming, he would be very irritated by it." Although he punched a wall on one occasion, he never displayed aggression toward her or the children.

Kimberly testified that Lopez began having stomach issues, weight changes, hair loss, and he had purple bags under his eyes from the lack of sleep. About one month before the incident, she went to check on him and noticed he was very pale, his heart

was racing, and he was sweating. Lopez repeatedly reassured her that he would be fine. Kimberly became increasingly worried when Lopez only communicated with her by writing in a notebook, tearing off the page, and then burning the writing behind her parent's house. Lopez also began peering through windows to check if someone was out to get him. Shortly before the shooting, Kimberly was having daily conversations with him about the government being out to get him and Kimberly collaborating or colluding with the government against Lopez. Lopez unplugged the televisions and radios in their home and in his vehicle because "he said they had a camera or they could hear us through the speaker." Kimberly informed the jury that a "couple of weeks before the shooting, [Lopez] would say that [his coworkers] would laugh at him. They would say stuff, that they were up to something but that he was going to figure it out."

According to Kimberly, immediately after the shooting, Lopez arrived at her home around 3:00 a.m. and stayed outside while he was on the phone. He repeatedly told her to go inside and to stay away from him. She stated that Lopez sat down on the neighbor's curb while he smoked several cigarettes. Kimberly peered inside his truck, noticed his gun case was empty, and she "got scared." The police arrived, and Lopez dropped down to his knees while he was handcuffed.

## C.    Expert Testimony

The following experts testified: psychiatrist Tomas A. Gonzalez, M.D.; psychologist Gregorio Pina, Ph.D.; psychiatrist Michael Ray Arambula, M.D., Pharm. D.; and psychiatrist Johanna Torres, M.D.

Dr. Gonzalez testified that he examined Lopez on three separate occasions: July 2017, September 2017, and December 2019. Each time, Lopez's condition remained the same. Dr. Gonzalez diagnosed Lopez with schizophrenia and psychosis and explained to the jury that Lopez suffered from a severe mental defect, paranoia, and delusions. According to Dr. Gonzalez, Lopez's parents suffered from a mental illness, which runs in the family. Because of this, when Lopez began displaying signs of a mental illness in high school, Lopez's parents repeatedly reassured Lopez that nothing was wrong with him. Dr. Gonzalez believed that Lopez has suffered from a mental illness for several years.

Dr. Pina testified that he was appointed by the trial court to conduct a competency evaluation to determine whether Lopez was competent to stand trial. Dr. Pina stated that Lopez's "evaluation became complicated mostly with what appeared to be concern over exaggeration of symptoms and obstinance." In his report, Dr. Pina noted that Lopez "appeared to exaggerate his symptoms beyond very ill psychotic basis and extremely low intellectually deficiency" and was acting "more like a person who is mentally retarded, intellectually disabled." Dr. Pina works in psychiatric hospitals all over the county, and Lopez "appeared to be more mentally ill than the worst of the people who were very, very ill as schizophrenics." According to Dr. Pina, Lopez's symptoms "were so excessive that it didn't fit in the picture of someone who is really mentally ill." Dr. Pina stated that although Lopez "was attempting to present himself with various symptoms of not being in touch with reality," Lopez "contradicted himself with the same interviews . . . and [he contradicted himself] across the medical information and the detention officers who were observing him getting along with everyone else in his [holding] tank." Dr. Pina diagnosed

8

Lopez as a "schizophrenic of a paranoid nature . . . with intermittent explosive disorder." Lopez's condition was "mild to moderate" schizophrenia with panic disorder presented as "malingering." As testified to by the medical experts, the term "malingering" means excessive exaggeration to obtain a secondary gain, and the term is not used unless necessary.

Dr. Arambula stated that he was also concerned with malingering because "the way in which [Lopez] described his hallucinations and paranoia was vague. And it was unusual even for somebody who actually has schizophrenia." For example, Lopez claimed to have "them only at work and not at home which didn't make any sense because if a mental illness exists, it's in the brain, and so wherever a person goes, so goes their brain. And so they're going to have symptoms wherever they are."

Dr. Arambula explained that "it's important to see what other medical professionals are observing and reporting in the records about what Lopez was like at the time of booking and the months following. Dr. Arambula stated that Lopez's medical reports at the time of his booking were "essentially normal. He was worried about losing his job . . . he denied any hallucinations, thoughts that people might be following him, sending him messages, he denied delusions. H[is] mental status exam looked normal. [Dr. Torres] who saw him said he was not psychotic." When Lopez informed Dr. Arambula that he had suicidal thoughts, Dr. Arambula inquired why Lopez never hurt himself. Lopez responded that he "was not dumb" and that "he knew the voices were just in his thoughts, and they weren't real. And so that's why he never made any suicidal attempts."

9

Dr. Arambula explored the possible connection between Lopez's mental illness and the shooting. Dr. Arambula testified that this incident was perplexing because Lopez denied having problems with his coworkers, he enjoyed working with them, he did not argue with them, and his coworkers were not part of his delusions. Lopez did not want to answer questions about why he shot each individual victim because Lopez stated he did not want to give incriminating statements and wanted to "move on."[2] Lopez was unable to articulate why he reloaded his gun and fired more shots.

Dr. Torres was the jail psychiatrist and examined Lopez. She diagnosed Lopez with panic disorder, and she prescribed different medications to treat his anxiety symptoms and to help with insomnia. When she examined Lopez, it did not appear to her that he was suffering from psychosis during her examinations. Each time that she examined Lopez, he was presenting with major anxiety symptoms, major auditory hallucinations, and, in her opinion, "he was facing illusions."

## D.     Conviction

The jury charge in the guilt-innocence phase of trial included instructions on the insanity defense, which the jury rejected. It found Lopez guilty of all counts. At Lopez's election, the trial court sentenced Lopez to the sentences as stated above. This appeal followed.

---

[2] For example, Lopez explained that he worked with one victim for five or six years, they got along, and they were friends. When Dr. Arambula asked why Lopez shot this victim, Lopez quickly said, "Next" to move on to another victim. Dr. Arambula then asked about another victim, and Lopez similarly responded "Next."

## II.   INSANITY DEFENSE[3]

By his first issue, Lopez challenges the factual sufficiency of the jury's rejection of the insanity defense, but he does not challenge the sufficiency of the evidence underlying the elements of the offense.

### A.   Standard of Review & Applicable Law

We presume that an accused is sane and intends the natural consequences of his actions. *See Ruffin v. State*, 270 S.W.3d 586, 591 (Tex. Crim. App. 2008). Insanity is an affirmative defense, and the defendant bears the burden to prove the issue by a preponderance of the evidence. *See* TEX. PENAL CODE ANN. §§ 2.04(d), 8.01(a); TEX. CODE CRIM. PROC. art. 46C.153(a)(2); *Ruffin*, 270 S.W.3d at 591–92. Even if the State proves all elements of the offense, a finding of insanity excuses the defendant from criminal responsibility. *Ruffin*, 270 S.W.3d at 592; TEX. CODE CRIM. PROC. art. 46C.153(a).

Insanity is defined as "a severe mental disease or defect" that resulted in the actor not knowing that his conduct was wrong at the time of the offense. TEX. PENAL CODE ANN. § 8.01(a). The focus is on whether the accused understood the nature of his action and whether he knew he should not do it. *Ruffin*, 270 S.W.3d at 592 n.17; *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994); *McAfee v. State*, 467 S.W.3d 622, 636 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). "If the accused knows that his conduct is 'illegal' by societal standards, then he understands that his conduct is wrong, even if,

---

[3] We address this issue first because it would provide the greatest relief sought. *See* TEX. R. APP. P. 47.1.

due to a mental disease or defect, he thinks his conduct is morally justified." *McAfee*, 467 S.W.3d at 636; *see Ruffin*, 270 S.W.3d at 592.

The insanity defense "is ultimately for the factfinder, not the expert." *Petetan v. State*, 622 S.W.3d 321, 360 (Tex. Crim. App. 2021); *see Graham v. State*, 566 S.W.2d 941, 950 (Tex. Crim. App. 1978) (stating that the defense "intertwin[es] moral, legal, and medical judgments" (quotation omitted)). The jury must consider "the inarticulable ethical component, which includes imperatives of free will, self[-]control, and responsibility for one's acts" that are fundamental to criminal responsibility. *See Graham*, 566 S.W.2d at 953; *see also Bigby*, 892 S.W.2d at 878 ("[O]nly the jury can join the non-medical components that must be considered in deciding the ultimate issue" of sanity, "[o]therwise the issue of sanity would be decided in the hospitals and not the courtrooms").

"Although jurors may not arbitrarily disregard expert testimony as to insanity, neither may they give conclusive effect to such testimony." *McAfee*, 467 S.W.3d at 636–37. The jury may accept or reject in whole or in part the opinion testimony of an expert and may accept lay testimony instead. *Graham*, 566 S.W.2d at 950–51. Rarely will we overturn a jury's findings concerning the insanity defense. *Id.* at 953.

In conducting a sufficiency review, we view the entirety of the evidence in a neutral light while preserving the factfinder's weight and credibility determinations. *See Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013).

> In analyzing a claim that a guilty verdict was against the great weight and preponderance of the evidence supporting an insanity defense, we consider all evidence relevant to the issue of insanity in a neutral light to determine whether the finding against the affirmative defense is so against the great weight and preponderance of the evidence as to be manifestly unjust.

*Reyna v. State*, 116 S.W.3d 362, 367 (Tex. App.—El Paso 2003, no pet.). If the evidence supporting the insanity defense greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, then we may reverse the judgment and remand the case for a new trial. *Matlock*, 392 S.W.3d at 672. "The issue of insanity at the time of the offense lies within the province of the jury, and we will overturn its decision only where insanity is undisputed or resolved to one end of the spectrum outside the realm of discretion." *Reyna*, 116 S.W.3d at 367. The circumstances of the crime itself—including attempts to conceal incriminating evidence or elude detection by law enforcement—can indicate knowledge of wrongful conduct. *Graham*, 566 S.W.2d at 951; *McAfee*, 467 S.W.3d at 637.

## B. Discussion

By challenging the sufficiency of the evidence to support an adverse finding, Lopez is asserting that the adverse finding on his affirmative defense was so against the great weight and preponderance of the entire body of admitted evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 670 n.29, 671. There is substantial evidence that Lopez suffered from a severe mental disease or defect before committing this offense. In his brief, Lopez focuses on the "severe mental disease or defect" component of insanity and provides little analysis of whether the evidence established that he did not know his conduct was wrong. *See* TEX. PENAL CODE ANN. § 8.01(a). However, to resolve this issue, we must evaluate the evidence at trial regarding Lopez's ability to distinguish right from wrong *at the time of the shooting. See id.*

In this regard, Dr. Gonzalez testified that Lopez was not able to make such a distinction as a result of his mental disease or defect: "In his mind, what he was doing

13

was right. He had to protect his family and himself in his mind." According to Dr. Gonzalez, "Lopez believed that at the time of the offense, that he was acting in self-defense, and to protect his family, guided and assisted by the auditory hallucinations in his head." Yet, on cross-examination, Dr. Gonzalez stated that Lopez had "an awareness that shooting a building was wrong." The State made the following inquiries:

[The State]:          And why would anybody call 9-1-1? Do you think that meant he knew it was wrong what he did?

[Dr. Gonzalez]:          Yes.

[The State]:          That it was illegal?

[Dr. Gonzalez]:          He knew . . . something wrong happened. But why did it happen, is the question.

[The State]:          No. The question is did he know that it was wrong, illegal.

[Dr. Gonzalez]:          Well, obviously.

[The State]:          Exactly.

[Dr. Gonzalez]:          Yeah.

Saenz testified that although Lopez suffered from mental issues, he was still able to work, provide for his family, and "knew right from wrong." The State asked Kimberly whether Lopez "understood that he had done something that was wrong" when he was apologizing and asking for forgiveness, to which Kimberly responded, "It looked like he knew." Dr. Pina similarly concluded that Lopez was able to make a distinction between right and wrong.

Dr. Arambula opined that Lopez was not psychotic during this 911 call, his memory was working, and it was "clear at that point that he recognized what he had done was

14

wrong when he called 9-1-1." *See Ruffin*, 270 S.W.3d at 592 ("[T]he question for deciding insanity is this: Does the defendant factually know that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified?"). Dr. Arambula testified that "the behavior at the time of an incident is very important," and acts like trying to flee and hiding the weapon "indicate that a person knows that what they did was wrong." Dr. Arambula did not feel the need to interrogate Lopez about the weapon because Lopez "hid the weapon, so it wouldn't incriminate him," and "that kind of behavioral evidence [] infers a knowledge that what somebody did is wrong. And that was clear in this case." *See Plough v. State*, 725 S.W.2d 494, 500 (Tex. App.—Corpus Christi–Edinburg 1987, no pet.) ("Attempts to conceal incriminatory evidence and to elude officers have been held to indicate cognizance of wrongful conduct. Similarly, surrendering to the police and confessing a crime has also been considered to indicate a realization of wrongful conduct.").

Furthermore, more than one expert was concerned with Lopez malingering. During his interview with Dr. Arambula, Lopez claimed to have amnesia. Yet, Lopez distinctly remembered the glass shattering, people dropping down for cover, and that he shot multiple times and reloaded. Lopez further remembered that he did not finish the second round before leaving the scene. In fact, Dr. Arambula believed Lopez had "a good recall of what he did." Thus, although Lopez recalled details from the shooting, Lopez continued to claim amnesia with other experts.

Lopez made the following statements indicative of an understanding that he knew his conduct was wrong: (1) he repeatedly told the dispatcher that he concealed the

weapon; (2) he repeatedly pleads with the female voice to leave the scene, so she would not seem involved; (3) he informs the female that he only came back to the residence to drop off his vehicle; (4) he informs the female that she needs to move on with her life; (5) he apologized to the female for his actions; (6) he tells the female that he would be going away; (7) he tries to convince the dispatcher that there is no other person there with him and that he can create different voices; and (8) he tells the dispatcher that he would wait on the line until officers would arrive to arrest him. *See Pham v. State*, 463 S.W.3d 660, 672 (Tex. App.—Amarillo 2015, pet. ref'd); *Torres v. State*, 976 S.W.2d 345, 347–48 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.) (holding that, in determining an insanity issue, jury may consider circumstantial evidence, including defendant's demeanor before and after committing crime, defendant's attempts to evade police or conceal incriminating evidence, defendant's expressions of regret or fear of consequences of actions, other possible motives for offense, and any other possible explanations for defendant's behavior).

The experts evaluated Lopez; reviewed multiple witnesses' statements; interviewed Lopez's family; and reviewed police reports, medical records, and photographs. Each expert reached a distinct and separate conclusion, each of which explained Lopez's behavior to the jury. We cannot substitute our judgment in place of the jury's assessment of the credibility of each of the experts' findings. *See Routh v. State*, 516 S.W.3d 677, 700 (Tex. App.—Eastland 2017, no pet.). The jury further heard testimony from several lay witnesses. Viewing the evidence in a neutral light while preserving the jury's credibility determinations, we hold that the jury's rejection of Lopez's

insanity defense was not so against the great weight of the evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 671; *McAfee*, 467 S.W.3d at 636; *Torres*, 976 S.W.2d at 348 ("[T]he jury's decision to disbelieve the insanity testimony was not so against the great weight and preponderance of the evidence that it was manifestly unjust, shocked the conscience, or clearly demonstrated bias."). We overrule Lopez's first issue.

### III.     MOTION TO SUPPRESS

By his second issue, Lopez argues that the trial court erred by failing to suppress his video-recorded oral interrogation because admission of this statement violated federal law under *Miranda v. Arizona*. *See* 384 U.S. 436 (1966). First, Lopez states that Detective Jurado "did **not** advise [him] that he had the right to have his lawyer present with him to advise him prior to and during questioning." Next, Lopez states that he did not voluntarily waive his *Miranda* rights because he was in a state of psychosis, and his statement was coerced. Lastly, Lopez argues that he invoked his fifth amendment right to counsel during the custodial interview. Because it is dispositive, we analyze Lopez's challenge to the adequacy of the *Miranda* warnings that were administered to him before the interrogation.

### A.     Standard of Review & Applicable Law

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019); *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We afford almost total deference to the trial court's findings of historical facts as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Abney v. State*, 394 S.W.3d 542, 547 (Tex. Crim. App. 2013). "The trial [court] is the sole judge of witness credibility and the

17

weight to be given to witness testimony." *Chumacero v. State*, 676 S.W.3d 878, 891 (Tex. App.—Corpus Christi–Edinburg 2023, pet. ref'd); *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). We review de novo the trial court's application of the law to the facts. *Valtierra*, 310 S.W.3d at 447.

We view the evidence in the light most favorable to the trial court's ruling, and countenance "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). The trial court's ruling will be upheld if it is supported by the record and correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

*Miranda* requires that a defendant be given specific warnings for statements resulting from custodial interrogation to be admissible. *See* 384 U.S. at 436. The purpose of Miranda warnings is "to protect [a person's] constitutional right to silence and his privilege against compelled self-incrimination." *Leza v. State*, 351 S.W.3d 344, 348 (Tex. Crim. App. 2011). The following warnings must be conveyed to a defendant:

(1)     he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2)     any statement he makes may be used as evidence against him in court;

(3)     he has the right to have a lawyer present to advise him prior to and during any questioning;

(4)     if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning.

*Miranda*, 384 U.S. at 436.

18

"If a statement has been found to be admitted in violation of *Miranda* or due process, we apply the constitutional-error harm analysis, which requires the error to be found harmful unless the appellate court 'determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.'" *Sandoval v. State*, 665 S.W.3d 496, 515 (Tex. Crim. App. 2022) (citing TEX. R. APP. 44.2(a)). The emphasis of a harm analysis pursuant to Rule 44.2(a) should not be on the propriety of the outcome of the trial. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). We do not review whether the jury verdict was supported by the evidence. *Id.* Instead, "the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict." *Id.* We assess whether "the error adversely affected 'the integrity of the process leading to the conviction.'" *Id.* Some nonexclusive factors that we consider are "the nature of the error," "whether it was emphasized by the State," "the probable implications of the error," and "the weight the jury would likely have assigned to it." *Snowden v. State*, S.W.3d 815, 822 (Tex. Crim. App. 2011).

## C.     Relevant Facts

Immediately following the shooting, Detective Jurado interviewed Lopez at the police station following Lopez's arrest. During the custodial interview, Detective Jurado first asks Lopez where he was born, whether Lopez is a U.S. citizen, where Lopez went to school, and what language Lopez felt more comfortable conversing in. Following the answers to those questions, Detective Jurado advised Lopez of his *Miranda* rights:

| | |
|---|---|
| Dt. Jurado: | You have the right to remain silent, [a]nything you say may be used against you in the trial. You have the right to talk to an attorney, to obtain advice before we ask you any questions . . . if you don't have the means to |

get an attorney, and you so wish, one will be appointed to you before you are asked any questions and if you decide to answer questions now, without the presence of an attorney, you still have to right to stop answering until you talk to an attorney. Do you understand these rights?

Lopez: [Nodding head up and down]

Dt. Jurado: How long have you been with HEB?

Lopez: Mmm. Me?

Dt. Jurado: Uh-huh.

Lopez: Well, where's the attorney?

Dt. Jurado: Huh?

Lopez: Where's the attorney? You say that I can retain an attorney.

Dt. Jurado: Uh-huh.

Lopez: And, where are those attorneys?

Dt. Jurado Do you have an attorney?

Lopez: [Shaking head side to side]

Dt. Jurado: Uh, this—in reality—this is a formality—

Lopez: —yes—

Dt. Jurado: —I'm talking with you, just as a formality, because—

Lopez: [Nodding head up and down]

Dt. Jurado: —from what I understand, I have not gone over there, you got nowhere to go.

Lopez: Uh-huh.

20

| | |
|---|---|
| Dt. Jurado: | Do you want to help yourself? Okay. Okay. You don't want to help yourself, it's the same to me. I'm tossing you the lifesaver, if you want to grab it, grab it . . . But the moment you ask for an attorney there's absolutely nothing that I can do for you. |

. . .

| | |
|---|---|
| Lopez: | But . . . that I don't have any rights. |
| Dt. Jurado: | Uh-huh. Rights. All of us, all of us have rights. I read them to you here, You told me that you had understood. |
| Lopez: | Well, just that I have—that you can get me—that I can get a lawyer and [unintelligible]— |
| Dt. Jurado: | [Overlapping] —you can— [Overlapping] |
| Lopez: | —[unintelligible] |
| Dt. Jurado: | —you can, okay, you can. But, you decided to talk with me. We are talking. |
| Lopez: | Uh-huh. |
| Dt. Jurado: | Right? |
| Lopez: | [Nodding head up and down] |
| Dt. Jurado: | That, that was your . . . I didn't force you to talk to me, right? It was your decision to talk with me, yes or no? |
| Lopez: | Hmm—huh. |
| Dt. Jurado: | And we're, we're talking. At the point, you tell me that you don't want to talk to me. We'll leave there, there, But, I have questions that you haven't answered. |

Thereafter, Lopez claimed he did not know why he was there; he was concerned with how long he would be in custody; he wanted to know if they would arrest him for something he did not do; and he repeatedly asked what his charges would be. Lopez also

21

inquired about "an injection" and what happens to people like him. Lopez informed Detective Jurado that he wanted to enter H-E-B "with a weapon, and that's it, so that they would arrest" him, but "no one was coming. [Lopez] never saw a cop, coming or something." Lopez explained to Detective Jurado that "it was better that [he] be apart from [his wife]. And well, what better way than going to jail, and it was, well, for things to calm down in Mexico . . . I could go and live there . . . . But, if someone was hurt well, then, there's nothing left for me to do."

Lopez drew a map indicating where he disposed of the weapon. The interview was almost two hours long, and it was played for the jury. It is this recorded statement that Lopez argues harmed his insanity defense.

## D.    Error

Here, Detective Jurado warned Lopez that he had a right to obtain advice from a lawyer before interrogation and that one may be appointed to him before interrogation. *See Miranda*, 384 U.S. at 470 (providing that law enforcement must advise the accused of his right to counsel prior to interrogation). However, *Miranda* also requires that the detective inform the accused that the accused has the right to have a lawyer present to advise him during any questioning. *See id.* Here, the record provides that Detective Jurado did not inform Lopez that he was entitled to a lawyer *during* questioning. *See id.* at 470–71 ("[T]he need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires."). At the suppression hearing,

22

during the State's questioning, Detective Jurado further confirmed that he did not advise

Lopez of this right:

> State: Did you advise him that he had the right to have a lawyer present to advise him before you questioned him and during the time that you were questioning him?
>
> Detective: No, ma'am.
>
> State: You're saying no, you did not give him that right to have a lawyer present before his questioning?
>
> Detective: No, ma'am.
>
> State: I'm trying to understand. Are you saying no, you didn't give him that right at all?
>
> Detective: I advised him he had the right to an attorney. That particular form that I read from does not state prior to and during any questioning.

Detective Jurado further confirmed the same during cross-examination:

> Defense: Did you inform Mr. Lopez that he had the right to have an attorney present prior to and during his interrogation? Do you remember [the State] asking you that?
>
> Detective: I do.
>
> Defense: And you told her, No, I didn't tell him that?
>
> Detective: It's not required.
>
> Defense: How do you know?
>
> Detective: Because you're only supposed to advise him that he has the right to an attorney.
>
> Defense: And is that what you did here?
>
> Detective: That's correct.

23

Defense: So, just so we're clear, you did not advise Mr. Raul Lopez that he had the right to an attorney, that he had the right to the counsel of an attorney, to have an attorney present prior to and during any questioning?

Detective: No, I did not.

Detective Jurado failed to inform Lopez of a right the United States Supreme Court has characterized as "an absolute prerequisite to interrogation." *See id.* at 471. Moreover, when Lopez questioned where his attorney was—on more than one instance—Detective Jurado failed to advise Lopez that Lopez had the right to an attorney during questioning. Instead, Detective Jurado responds that Lopez "decided" to talk to Detective Jurado and that Detective Jurado did not force Lopez to talk to him, implying that Lopez did not have the right to counsel *during* questioning.

Because Detective Jurado did not provide Lopez with the required *Miranda* warning that he had the right to have an attorney present during questioning, Detective Jurado failed to substantially comply with *Miranda. See id.*; *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009) ("Among the rights about which the police must advise a suspect whom they have arrested is the right to have counsel present *during* any police-initiated interrogation." (emphasis added)); *Carter v. State*, 309 S.W.3d 31, 35–36 (Tex. Crim. App. 2010) ("Failure to provide the warnings and obtain a waiver prior to custodial questioning generally requires exclusion of statements obtained."); *Coffey v. State*, 435 S.W.3d 834, 843 (Tex. App.—Texarkana 2014, pet. ref'd) ("Because Coffey was not provided with the required *Miranda* and statutory warning that he had the right to have an attorney present during questioning . . . the recorded statement was inadmissible."); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(e)(2) (Unless the accused is given these

24

admonishments or their "fully effective equivalent," an oral statement resulting from custodial interrogation is inadmissible.). The trial court's admission of this statement is constitutional error, and Rule 44.2(a) is applicable. *See* TEX. R. APP. P. 44.2(a); *Akins v. State*, 202 S.W.3d 879, 891 (Tex. App.—Fort Worth 2006, pet. ref'd); *see also Coffey*, 435 S.W.3d at 843. We now address whether the trial court's error in admitting the statement was harmful.

## E.      Harm

In the context of Rule 44.2(a), we must find the error harmful unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction," which in this case is the rejection of the insanity defense. *Sandoval*, 665 S.W.3d at 515; *Higginbotham v. State*, 807 S.W.2d 732, 735 (Tex. Crim. App. 1991) (*Higginbotham II*) ("The reviewing court must focus on the 'the process and not on the result.'"). The facts in *Higginbothm II* are analogous to the facts here, so we look to *Higginbotham II* for guidance. *See id.* In *Higginbotham I*, the court of appeals found that appellant's confession at the police station was improperly obtained in violation of *Miranda* and held that the admission of the confession was harmless error because there was "an abundance of overwhelming evidence demonstrating appellant's guilt," "the confession was merely cumulative of existing relative facts," and "the State did not need [the confession] to establish appellant's guilt in committing the crime." *Higginbotham v. State*, 769 S.W.2d 265 (Tex. App.—Houston [14th Dist.] 1989) (*Higginbotham I*), *rev'd*, 807 S.W.2d at 732. In *Higginbotham II*, the Texas Court of Criminal Appeals examined whether the inadmissible evidence was harmful by applying several factors including: (1)

25

if the State emphasized the error; (2) the probable collateral implications; (3) the weight that the jury may have assigned to the erroneous admitted evidence; and (4) other relevant evidence. *See* 807 S.W.2d at 735. After analyzing the factors, the court held that there was evidence in the record to support appellant's contention that "the admission of the taped confession was harmful, not in the sense that it contributed to a finding of guilt, but that it affected the jury's rejection" of his insanity defense. *Id.* at 733. Therefore, it reversed appellant's capital murder conviction and remanded the case for a new trial *See id.* at 738.

### i)      Error Emphasized by the State

In *Higginbotham II,* the Court reviewed the state's argument, which connected appellant's demeanor with the insanity defense. *See id.* at 735. The state briefly argued: the officer testified that appellant gave a detailed statement in regards to this offense; the officer had no regard to appellant's mental illness during the interview; appellant appeared to the officer to know that he had done something wrong; appellant was able to relate the offense to the officer; appellant was able to tell the officer what he had done in detail; appellant was not detached from what was going on; and there was nothing to indicate appellant did not understand what was happening. *Id.* The Court concluded that the state's argument:

> [p]ointing out appellant's rational behavior at the time of the confession seems tantamount to an argument that the confession shows appellant was sane at the time the confession was given. Any rational trier of fact would be able to draw such a conclusion. The connection between appellant's demeanor at the time of the confession and his sanity at the time of the offense is less than tenuous.

*Id.*

26

Here, the State argued: "There's no doubt that [] Lopez committed this crime. . . He said 'I did it.' You saw him on the video"; that as soon as Lopez gets interrogated, "he pretends again"; he pretended he does not know what happened; "he knew that he did something wrong by the time he went to the Palmview PD, he was worried about his consequences"; he questioned what happened to him; he questioned what "do they do to people like" him; and whether he would receive the death penalty; he was only concerned with himself; he clearly remembered someone falling to the ground and loading more magazines; Detective Jurado testified that it appeared to him Lopez was pretending that he did not remember and pretending not to know what happened; Lopez stated to Detective Jurado that he wanted to go to jail because he was tired of everything; Lopez knew his conduct was wrong because when he arrived at the police department; and Lopez was only worried about himself and potential criminal consequences.

Like the prosecutor in *Higginbotham II*, here, during argument, the State emphasized Lopez's rational state of mind during the confession, which connected Lopez's demeanor with the insanity defense. Thus, the State's argument is tantamount to an argument that Lopez was sane during the interrogation, and a jury would have been able to draw such a conclusion. *Id.* Therefore, the connection between Lopez's "demeanor at the time of the confession and his sanity at the time of the offense is less than tenuous." *Id.* at 735–736.

In *Higginbotham II*'s review of record, the court revealed "many more instances in which the State emphasized the calm and collected state of appellant during the interview

27

in which the confession was obtained." *Id.* at 736. The court found four different lines of

questioning with the officer, each of which questioned appellant's demeanor:

State: Up until that time had the defendant exhibited any characteristics out of the ordinary?

Officer: No, he was very calm.

State: And then for some twenty to twenty-five seconds he spoke in tongues. What happened after he spoke in tongues?

Officer: He was fine.

State: Did he go back to the same demeanor or attitude characteristics that he had prior to that episode?

Officer: Yes, he did.

. . . .

State: And was there anything that the defendant said that appeared to you to be out of the ordinary in such a proceeding?

Officer: No, he was very calm and very attentive and appeared to know everything that was going on.

. . . .

State: Would you describe that voice as being a calm voice?

Officer: Yes, sir, I would say that he was relatively calm.

State: And you indicated that he was being cooperative with you at all times?

Officer: Yes, sir, he was.

State: Did you find that to be unusual or out of the ordinary for someone to be calm, to be cooperative in that type of situation?

Officer: Maybe just somewhat a little unusual due to the circumstances of what had happened.

State:      And how do you feel that was somewhat unusual?

Officer:    Oh, many suspects that will come in will be—some may be quite nervous, some may be a little upset, some may even indicate remorsefulness and that didn't really come across with Neil.

. . . .

State:      In any of the conversations that you had with the defendant was there anything that he said or did that would lead you to believe that he was emotionally unstable in regard to this incident?

Officer:    Neil was very calm and acted quite normal during the whole course of the interview.

*Id.*

In this case, the State heavily emphasized—throughout the trial—how Lopez's statements to Detective Jurado showed Lopez was sane immediately following the shooting. To illustrate, during its cross-examination of Dr. Gonzalez, the State went through the entire transcript of Lopez's interrogation video, which was several pages long while in *Higginbotham II*, the Court only focused on four lines of questioning. *See id.* Regarding Lopez's interrogation, the State questioned Dr. Gonzalez whether Lopez: lacked "disorganized speech or disorganized thinking"; attempted to set up "a defense for himself"; was primarily concerned with figuring out the consequences of his actions; repeatedly stated he was "not paranoid" and "not crazy"; feigned amnesia throughout the interview because he remembered many details; clarified his motive for shooting; wanted to "scare them"; continuously made sense throughout the interview; desired to go to jail; felt like there was no way out; had full awareness of his state of mind; wanted to know who died; was not sorry for what he did; drew a sketch illustrating where the gun was;

29

and consistently denied having a mental illness throughout his interview with Detective Jurado. Dr. Gonzalez repeatedly read—verbatim—questions posed by Detective Jurado and Lopez's answers to those specific questions. Furthermore, based on the State's questions, Dr. Gonzalez also emphasized that during the interview, Detective Jurado asked Lopez if he had a psychological problem, whether Lopez suffered from paranoia, whether there was something wrong with Lopez, whether Lopez had seen a psychologist; and thus, "a nonmedical, non-psychologically trained person sees something wrong." We find the State's emphasis on Lopez's sanity much stronger than that in *Higginbohtam II*.

Moreover, the State asked Dr. Arambula to discuss Lopez's concerns during his interrogation, such as: whether it appeared Lopez "was trying to fish for information from the investigator"; whether "he worried about losing his wife and family"; Lopez's statements that he was better off in jail; Lopez's statements that his coworkers were going to be the demise of his relationship with his wife; Lopez's statements that he just wanted to scare his coworkers; Lopez's desire to be arrested; whether in the interview it appeared Lopez had been planning something illegal to get arrested; and what Lopez's "main goal" was. According to Dr. Arambula, Lopez's statement to Detective Jurado that he wanted to enter HEB and brandish a weapon to scare "them" and for officers to come arrest him is indicative of Lopez's goal to get arrested and go to jail, such that he knew his conduct was wrong at the time of the offense—the crux of what lead the Court in *Higginbotham II* to conclude the jury was likely influenced.

The frequency of the State's questions in this case, as compared to those four instances with the officer in *Higginbotham II*, is much more prominent and emphasized.

30

*See id.* at 736. Nearly the entirety of the State's cross-examination of Dr. Gonzalez emphasized Lopez's interview with Detective Jurado and Lopez's sanity at the time as opposed to the four lines of questioning in *Higginbotham II.* Accordingly, we must conclude that the jury was likely influenced by the confession on the issue of insanity. *See id.* at 736–737 ("The frequency of the prosecutor's questions regarding appellant's demeanor, and his emphasis on appellant's calmness during the recording of the confession itself in the context of the entire record, lead this Court to believe that the jury was likely influenced by the confession on the issue of insanity.").

### ii) Probable Collateral Implications

In *Higginbotham II*, the court stated that the collateral implications of the admission of the interrogation video were "severe and obvious" as they disparaged appellant's sole defense. *Id.* at 737. The jury heard the taped confession played in court, "then was exposed to the prosecutor's questions about appellant's calm demeanor and cooperative attitude during the taping," and therefore "the jury was apt to conclude that appellant was not insane at the time of the offense." *Id.* The court held that without the confession, the jury would be less likely to draw such a conclusion because there was evidence after the shooting that appellant was hysterical and irrational; witnesses testified that after the murder appellant went inside his home and showed concern for the SWAT team; refused to surrender to anything but the "Christian police"; and appellant stated he was the "Son of King David." *Id.* Other witnesses testified that appellant had quick and unpredictable swings between rationality and paranoia, and his medical records were admitted confirming the constant shifting between rationality and paranoia. *Id.* The court held that

31

"[r]easonably, the jury might conclude after hearing the confession that appellant was calm at least a few hours after the offense." *Id.*

Here, the jury heard the confession played in court, it was exposed to the State's questions about Lopez's calm demeanor and lack of psychosis throughout the interview from more than one witness. Like the Court in *Higginbotham II*, we conclude that without the confession, the jury would be less likely to conclude that Lopez was sane at the time of the offense because there was also evidence immediately after the shooting that Lopez was irrational. *See id.* For example, in the 911 call, Lopez first stated he was intoxicated then stated he was not; Lopez confessed to the shooting then he stated he did not do the shooting; Lopez informed the dispatcher that they have always known where he is; Lopez also stated that he does not have a last name, likes to talk to himself, and likes to make different voices, and that nothing happened just now. Dr. Gonzalez stated that Lopez's 911 call was that of "an inconsistent psychotic man"; Lopez was in a "psychotic state", and that what the jury heard in that call was a psychotic schizophrenic person. Dr. Gonzalez explained how Lopez was able to shift between instances of rationality and paranoia. Furthermore, numerous witnesses testified regarding Lopez's paranoia. Multiple experts confirmed that Lopez transitions between rationality and different mental states such as illusions, paranoia, anxiety, etc. Additionally, Dr. Gonzalez testified that in his "medical opinion that [Lopez] did suffer from a mental illness and defect that interfered with his understanding of his behavior, and that defect of reason did not allow him to understand what he was doing was wrong." Here, the 911 call supports such a finding in the way he communicates with the dispatcher. According to Dr. Gonzalez, Lopez called

911 "in a very confused manner . . . he flip-flops, he changes, he's confused, he's tangential, disorganized . . . he jumps around." Dr. Gonzalez explained:

> The illness does not allow him to think like you or me . . . He doesn't go from A to B like you or I do . . . He jumps around and the voices come and the paranoia comes and the hallucinations come, and then in moments of normalcy, oh, shoot, I did something wrong. As you continue the 9-1-1 call, there's a back and forth . . . there isn't a clear flow of thought from him.

Furthermore, no expert examined Lopez immediately following the shooting. Like *Higginbotham II*, we find that "[r]easonably, the jury might conclude after hearing the confession [with Detective Jurado] that [Lopez] was calm at least a few hours after the offense."[4] *Id.*

### iii) Weight the Jury Assigned to the Error

In *Higginbotham II*, the Court held that the "jury placed great weight on the taped confession in its deliberations" because it sent a note asking to hear the confession and a recorder, it deliberated for about eight hours, and the trial court commented on the difficulty of the case. *See id.* In this case, the jury deliberated for about ten hours, the trial lasted over two weeks long, and the trial court and the attorneys commented on the complexity of the case. "In light of the amount of evidence supporting both the State's and defense's theory about appellant's sanity at the time of the offense, this Court cannot discern that the confession was harmless beyond a reasonable doubt." *Id.*

---

[4] *Higginbotham II* concluded that another collateral consequence was the error's effect on sentencing because it was logical that a jury would be more likely to give a harsher punishment to a defendant who seemed unaffected after the offense than one who shows remorse. *Higginbotham v. State*, 807 S.W.2d 732, 737 (Tex. Crim. App. 1991) ("Without admission of the illegally obtained confession, the State would not have had the chance to comment on whether appellant showed remorse. Therefore, a probable [e]ffect on the harshness of punishment is also collateral to the admission of the confession."). The State similarly commented on Lopez's lack of remorse during the interview; however, because the trial court imposed the sentence, we will not consider this factor. *See id.*

### iv) Other Relevant Evidence

Other considerations may logically serve to inform a proper harm analysis. *Snowden*, 353 S.W.3d at 822. Here, the State emphasized Lopez's rational behavior at the time of the confession in its opening statement. According to the State, "By [Lopez's] own statements in the interrogation, he said he wanted to go to jail. So he says, yeah, he's sane." In its opening statement, the State stated:

> [Detective] Jurado gets there, and at that point [Lopez] sits down and talks to the [detective]. But then, he's claiming amnesia. He says, why am I here? What did I do? The [detective] says, what do you mean, why are you here? You just called 911. You just said that shooting at the H-E-B.
>
> Well, it's at that point that they start talking, and then the defendant is like, well, where is my attorney. The [detective] says, you already confessed. I'm just trying to figure out what did you [do]. At that point, it was [Detective] Jurado's role to find out what had happened with the weapon. He needed the gun. He already knew he did it. He called 911 and said, I did it. So [Detective] Jurado wanted to know where the gun was. And the whole time that [Detective] Jurado is talking to him, the defendant is only worried about one thing, and that one thing he's worried about is the consequences to his action. Oh, he doesn't remember. He doesn't remember what happened, but he knows that it's serious. He knows what he did. He wants to know if he's going to get the death penalty. Like, do people that do things like I do get the death penalty, he asked the [detective]. The [detective] kept talking to him. It's a pretty lengthy interrogation or questioning, really, which was about an hour.
> . . . .
>
> And the [detective] also wanted to know why he did this. He couldn't—he says, well, whatever I did, I didn't mean to do it. I just wanted to scare them. Yeah, he knew what he did. But from the very beginning, you're going to see the manipulative nature of the defendant. And all throughout the statement, he says, well, I didn't mean to hurt anybody, so why should I have remorse? All I want to know is did anybody die. Again, was he concerned about, only about his consequences.
>
> Throughout the interview, [Detective] Jurado was able to—and you're going to hear the interview—was able to finally get him to admit why he did this. And the only defendant's words, he says, well, I was tired of

them. They were bothering me. I just wanted to end the show. He says, I wanted to go to jail.

> You're also going to hear how in the beginning, he tells the [detective], I'm not crazy, and I'm not paranoid. These people were getting to me, and I needed to stop it, and I wanted to go to jail. Because at that point, he says, I know I'm going—he knew he was on the verge of losing his job at H-E-B. So he's like, well, what am I going to do without a job at H-E-B, who is going to hire me, I have an attitude. And then who is going to take care of my family. So I was going to lose everybody anyway, so he blamed H-E-B and everybody there for his own actions for what he did. And you're going to hear it out of his mouth. That's what he said.

> The [detective] kept talking to him and says, well, you know, maybe you should tell us what you did with the gun, maybe it would show some remorse, maybe it'll show something, you know. A jury is going to need to see that you're trying to cooperate because this isn't about if you did it. You did it. You already said you did it. Even though he would not mention what he did the whole interview.

Thus, the State set out its theory that Lopez was rational at the time of the shooting because he was able to cooperate and was lucid throughout the investigation.

### v) Summary

The constitutional-error harm analysis requires the error to be found harmful unless the appellate court "determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *Sandoval*, 665 S.W.3d at 515. "[T]he reviewing court must be able to declare itself satisfied, to a level of confidence beyond a reasonable doubt, that the error did not contribute to the conviction before it can affirm it." *Scott*, 227 S.W.3d at 690. After our own review of the record and analyzing the factors as set out by the Texas Court of Criminal Appeals, we are unable to determine beyond a reasonable doubt that Lopez's confession to Detective Jurado did not contribute to the jury's rejection of his insanity defense. *See Sandoval*, 665 S.W.3d at 515; *see also Mitten*

*v. State*, 228 S.W.3d 693, (Tex. App.—Corpus Christi–Edinburg 2005, pet ref'd) (reversing and remanding a capital murder charge after finding harmful error in a non-constitutional harm analysis where the trial court's admission of the defendant's statement was prejudicial to his insanity defense). We sustain Lopez's second issue, and we remand the cause to the trial court for a new trial. Because this issue is dispositive, we need not consider Lopez's remaining issues. *See* TEX. R. APP. P. 47.1.

## IV. CONCLUSION

We reverse and remand the cause to the trial court for proceedings consistent with this opinion.

JAIME TIJERINA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
17th day of October, 2024.